**Paul R. EDWARDS, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

**No. 91–SC–684–MR.**

Supreme Court of Kentucky.

June 25, 1992.

Rehearing Denied Aug. 27, 1992.

Herbert T. West, Fayette County Legal Aid, Lexington, for appellant.

Chris Gorman, Atty. Gen., Lana Grandon, Asst. Atty. Gen., Criminal Appellate Div., Frankfort, for appellee.

SPAIN, Justice.

Appellant, Paul R. Edwards, was convicted by a jury of first-degree sodomy and first-degree sexual abuse. After waiving jury sentencing, he was sentenced by the trial judge to twenty years' imprisonment for the sodomy conviction and one year for the sexual abuse conviction, to run concurrently.

Appellant lived with Martha Lowry for nine years. During that time, Martha Lowry's grandson, J.L., came to live with her shortly after he was born on July 4, 1984. When J.L. was five, Martha Lowry was no longer physically able to take care of him, so J.L. was placed by CHR, in May 1989, in a foster home. J.L. visited his grandmother without supervision approximately six times between September and November, 1989. Appellant was at the apartment during some of the visits.

Upon returning from his visit on November 21, 1989, J.L., appearing distressed, and without being asked any questions about it, spontaneously told his foster mother, Olene Gutierrez, "Paul hurt my butt." Ms. Gutierrez observed inflammation and bleeding in J.L.'s rectal area and immediately called a social worker.

J.L. was physically examined some weeks later, on January 4, 1990, by a physician, Dr. Gary Kearl, who is on the faculty of the University of Kentucky College of Medicine, engages in family practice, and accepts referrals of children suspected of having been sexually abused. The Department of Social Services made the referral for examination and treatment.

J.L. was also seen on two occasions by Ms. Lisa Barlow–Elliott, a clinical psychologist who does evaluation and therapy for

alleged child abuse victims at the University of Kentucky Child Abuse Clinic. She testified that J.L. was referred to her by Detective Fran Carr for two purposes: (1) to see if a trained therapist could help him explain what had happened to him, and (2) to evaluate his treatment needs and to make treatment recommendations.

The three issues on appeal arise from the testimony of Dr. Kearl, Ms. Barlow–Elliott, and Ms. Gutierrez. Each witness testified as to statements J.L. had made to them. J.L. was found by the trial court not competent to testify.

■ Dr. Kearl testified that when he took J.L.'s patient history, he asked J.L. why he was there. Although J.L. was quiet and talked in a whisper, he said he needed a checkup. When Dr. Kearl asked why he needed a checkup, J.L. said his bottom had been hurt. Dr. Kearl then asked him who hurt his bottom, and J.L. said Paul had hurt his bottom. J.L. further explained, when asked how it had happened, that Paul hurt him from behind in his bottom with his private parts. Dr. Kearl noted finding a triangular-shaped tear on J.L.'s perianal skin. Though the wound was not fresh, neither was it fully healed.

Concerning Dr. Kearl's testimony, appellant recognizes the exception to the hearsay rule that statements made for the purpose of medical diagnosis or treatment are admissible. However, appellant points out that such statements must be the kind of information which the expert customarily relies upon in the practice of his profession. Appellant admits that the portion of J.L.'s statement describing *what* happened to him was important to Dr. Kearl's diagnosis and treatment, but argues that the portion of the statement that *identifies* the abuser was not pertinent to Dr. Kearl's diagnosis and treatment.

Appellant cited *Souder v. Commonwealth*, Ky., 719 S.W.2d 730 (1986), which states that the admissibility of information which is important to an effective diagnosis or treatment "does not include information provided as part of a criminal investigation, nor does it usually include information

identifying the name of the wrongdoer because normally the name of the wrongdoer is not essential to treatment." *Id.* at 735.

The Commonwealth responded that in this case, however, the identity was essential to Dr. Kearl's diagnosis and treatment. Dr. Kearl testified that he had to know who the abuser was in order to prevent future harm to the child and to prevent the spread of a sexually transmitted disease, chlamydia, for which J.L. tested positive in his rectal area. The Commonwealth cited *United States v. Renville*, 779 F.2d 430 (8th Cir.1985), which held, "[w]e therefore believe that statements of identity to a physician by a child sexually abused by a family member are of a type physicians reasonably rely on in composing a diagnosis and course of treatment." *Id.* at 438.

In *Renville*, the Court made this exception to the general rule that physicians rarely have reason to rely on statements of identity because of two important aspects involved in the case: (1) the physician was not merely diagnosing and treating the child/patient for physical injuries but psychological injuries as well, and (2) the abuser was a *family*, household member.

The physician in that case testified that he was treating the child for her emotional and physical trauma. He also said that the identity of the abuser was extremely important to him in helping the child work through her problems. The identity was also particularly important if the abuser lived with the child, because the abuse would likely continue as long as the child remained in the household with the abuser.

■ Appellant also attacks Ms. Barlow–Elliott's testimony as to J.L.'s statements to her on his two office visits. She testified that J.L. blurted out to her, "Paul touched my pee pee, he hurt my butt," and that this was not in response to any questioning by her. Subsequently, in answer to questions from his therapist, J.L. stated that Paul had touched his "pee pee" with his hands more than once and that Paul's "pee pee" went inside him and "it hurt."

In insisting that these statements ought to have been excluded, appellant states

that "the record clearly reveals" that the psychologist was consulted for purposes of the criminal investigation. This conclusion apparently is drawn from the fact that the victim was referred to Ms. Barlow–Elliott by Detective Frances Carr, who was not only concerned about J.L.'s behavior but also about "how much he could talk about what had happened to him."

We believe that this is an unfair inference by appellant from the testimony. Even the most hardened cynic would concede that police detectives are human, too, and are on many occasions motivated by a genuine concern for victims of crime, separate and apart from their duty to solve crimes and enforce the law.

In any case, regardless of Ms. Carr's motivation in the referral, it is abundantly "clear from the record," and the trial court specifically so found, that Ms. Barlow–Elliott's purpose in seeing J.L. was to determine what had happened to the child and what therapy or treatment was needed. She stated that the information received from the victim was necessary for her evaluation and treatment of the child and that, based upon the answers given, she could make recommendations as to the treatment appropriate to relieve the symptoms demonstrated by the child.

In the case before us, the trial judge held a hearing *in limine* more than six months before the trial and heard the testimony of Dr. Kearl, Ms. Barlow–Elliott, Ms. Gutierrez, and the social worker, Joetta Robertson. In his very thorough, well-reasoned Findings of Fact, Conclusions of Law and Order, the court stated:

It is the conclusion of the Court that the testimony of Dr. Kearl and Ms. Barlow–Elliott is competent whether or not the child James is competent to testify. The Court relies upon the case of *Drumm v. Commonwealth*, Ky., 783 S.W.2d 380 [(1990)] wherein the Supreme Court of Kentucky adopted the provisions of Fed.R.Evid. 803(4) and the case of *United States v. Renville*, 779 F.2d 430 (8th Cir., 1985). This Court finds that the statements are relevant to the issues before the Court and have

substantial reliability. Their probative value outweighs their prejudicial effect.

This Court concludes that the testimony of the foster parent, Olene Gutierrez, is admissible under the "spontaneous statement exception" to the hearsay rule as set out in Lawson, *Kentucky Evidence Law Handbook*, 8.60(B) (2d.Ed., 1984). See also *Souder v. Commonwealth*, Ky., 719 S.W.2d 730. [(1986)]

The statements were made by the child to his foster parent immediately upon return from a short visit with his grandmother, during which time the events occurred. The statements were made under the stress of pain from injury and no doubt, with the expectation that the foster parent would "make it well." The Court can find no reason for fabrication under the circumstances. The statements were made spontaneously and not in response to any question.

■ We agree with the criteria against which the trial court measured the admissibility of the hearsay statements of J.L. and, moreover, agree with his conclusions as to their probative value.

■ As further evidence of his objectivity and fairness, we observe that the trial judge sustained the defense motion to exclude the hearsay statements of J.L. made in the presence of Social Worker Robertson several months after the crimes occurred, finding that their potential for prejudice outweighed their probative value.

We are of the opinion that the trial court ruled correctly as to each of the four hearsay statements and committed no error. Accordingly, the judgment of conviction and sentence of the Fayette Circuit Court are affirmed.

COMBS, LAMBERT, REYNOLDS and WINTERSHEIMER, JJ., join in this opinion.

STEPHENS, C.J., dissents by separate opinion, in which LEIBSON, J., joins.

LEIBSON, J., dissents by separate opinion.

STEPHENS, Chief Justice, dissenting.

I respectfully dissent.

The trial court erred in admitting both the testimony of the foster parent, Olene Gutierrez, under the spontaneous statement exception to the hearsay rule, *See Souder v. Commonwealth*, Ky., 719 S.W.2d 730 (1986), and the testimony of Dr. Kearl, that repeated the child's identification of the perpetrator to him, under the statement made for the purpose of medical diagnosis or treatment exception to the hearsay rule, *See* Fed.R.Evid. 803(4); *United States v. Renville*, 779 F.2d 430 (8th Cir.1985); *Drumm v. Commonwealth*, Ky., 783 S.W.2d 380 (1990).

The spontaneous statement exception to hearsay admits extrajudicial statements made in response to a startling occurrence or event if they are spontaneous, relate to the startling occurrence or event, and consist of data that would be competent evidence if presented as testimony by the declarant. *Mounce v. Commonwealth*, Ky., 795 S.W.2d 375 (1990), *quoting* R. Lawson, *Kentucky Evidence Law Handbook*, 8.60(a) (2d ed. 1984). Whether a particular statement qualifies as a "spontaneous utterance depends upon the particular circumstances in each case." *Consolidated Coach Corp. v. Earl's Adm'r*, 263 Ky. 814, 94 S.W.2d 6, 8 (1936).

The theory behind this exception is that circumstances produce a condition of excitement which temporarily suspends the declarant's capacity to reflect, and thus basically eliminates the possibility that the declarant is fabricating his statement. *Preston v. Commonwealth*, Ky., 406 S.W.2d 398, 401 (1966), *cert. denied*, 386 U.S. 920, 87 S.Ct. 886, 17 L.Ed.2d 792 (1967), *quoting* 6 *J. Wigmore on Evidence*, § 1747 at 135 (1976). Spontaneity, thus, is of primary importance in determining whether a statement under this hearsay rule exception is admissible because if the declarant is under the shock of the event, and his nervous excitement has not elapsed, reliability of the statement is more assured. *See Preston, supra* 406 S.W.2d at 401. "[S]pontaneity is the principal, and often the only, guarantee of trustworthiness [for this exception, and] its absence should result in the exclusion of the statement," J. Strong, *McCormick on Evidence*, § 270, Vol. 2 (4th ed. 1992).

While no bright line rule exists to define whether a statement was indeed "spontaneous," this determination should be made by examining in each case:

(1) lapse of time between the main act and the declaration, (2) the opportunity or likelihood of fabrication, (3) the inducement to fabrication, (4) the actual excitement of the declarant, (5) the place of the declaration, (6) the presence there of visible results of the act or occurrence to which the utterance relates, (7) whether the utterance was made in response to a question, and (8) whether the declaration was against interest or self-serving. *Souder, supra*, at 733.

The hearsay statement made by the boy to Ms. Gutierrez, in which he identified the perpetrator, was not spontaneous, for it was not made near the time of the occurrence, nor do circumstances surrounding its communication to the foster parent, infer its spontaneity. While the child's last unsupervised visit with his grandmother, Martha Lowry, occurred on November 21, 1989, Ms. Gutierrez on cross-examination stated that the boy, on December 13, 1989, finally identified "Paul" as the perpetrator. Thus the statement, "Paul hurt my butt" cannot be characterized as a spontaneous statement, since almost three weeks elapsed between the possible "startling event," and the boy relating the occurrence to Ms. Gutierrez.

Lapse of time between the startling event and the out-of-court statement is not fully dispositive in determining whether a statement falls within this hearsay exception, but the fact that such statements are relayed at the child's first opportunity to speak, contributes to their trustworthiness. Trustworthiness is to be inferred in this situation, because it is argued, there is less likelihood of fabrication. Here, the child had ample opportunity to communicate with his foster parent, well before the time that he identified appellant as the perpetrator. Such a time lapse between the star-

tling event and communication of it by the boy, infers "the opportunity or likelihood of fabrication" as identified in *Souder, supra,* for the "first opportunity" for the child to speak was not utilized.

I thus conclude that circumstances surrounding the boy's statement to Ms. Guitierrez were too remote and unreliable to fit within the spontaneous statement exception to the hearsay rule; this evidence therefore, was impermissibly introduced against the appellant.

Likewise, the trial court erred in admitting the portion of Dr. Kearl's testimony, relating that the boy identified the appellant as the perpetrator. While *Drumm, supra,* recognizes the exception to the hearsay rule that admits statements made for the purpose of diagnosis or treatment, the segment of Dr. Kearl's statement, relating the identification of appellant as the abuser, is not pertinent to diagnosis or treatment.

Reliability of statements made for the purpose of diagnosis or treatment is based on the theory that the patient believes his accurate report to the physician of his condition is essential to his receiving medical treatment. J. Strong, *McCormick on Evidence,* § 277, *supra.* Thus while a description of cause is admissible as medically pertinent under this hearsay rule exception, statements of fault, which include identifying the perpetrator of the condition, will unlikely qualify within its purview. *Id.;* C.J.S., Evidence, § 246(b); Mosteller, *Child Sexual Abuse and Statements for the Purpose of Medical Diagnosis or Treatment,* 67 N.C.L.Rev. 257, 258 (1989).

This Court, in *Souder, supra* at 735, when it reviewed whether medical records were admissible as "important to an effective diagnosis or treatment," noted that the medical records hearsay rule exception:

does [not] usually include information identifying the name of the wrongdoer because normally the name of the wrongdoer is not essential to treatment.

Reliance by the majority opinion on the exception to the hearsay rule that admits statements of identity of the perpetrator made to a physician, as found in *United States v. Renville, supra,* is misplaced, for the case at bar is factually distinguishable. In *United States v. Renville, supra,* as the majority notes, statements of identity were relevant to medical treatment because: (1) the physician was not merely diagnosing and treating the child for physical injuries, but was also treating the child's psychological injuries, and (2) the abuser was a *family, household* member.

The court in *Renville, supra* at 436, applied Fed.R.Evid. 803(4) and allowed statements of the young victim of sexual abuse, to identify the perpetrator, by applying a two-part test found in *United States v. Iron Shell,* 633 F.2d 77 (8th Cir.1980), *cert. denied,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981), that consists of:

(1) the declarant's motive in making the statement must be consistent with the purpose of promoting treatment, and

(2) the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis.

Dr. Kearl, unlike the physician in *Renville, supra,* only performed an examination in order to make a diagnosis of the child's physical condition, while the physician in *Renville, supra,* examined and treated the child for its physical and *psychological condition.* Dr. Kearl's testimony, relating the "patient's history," fails to show how he relied on the abuser's identity in diagnosis or treatment. Neither does the record reveal how identity of the abuser was important in protecting the child from future harm, because unlike the facts in *Renville, supra,* the child was no longer "at risk" for he did not live with his grandmother, nor was he subject to any more unsupervised visitation with his grandmother, the scenario that initially exposed the child to the appellant.

The trial court improperly admitted the portion of Dr. Kearl's testimony that contained the victim's statement identifying the abuser, because it was neither used in treating the child's physical condition, nor was it made by the child to receive treatment for his physical condition.

For the reasons thus stated, I would reverse appellant's conviction and remand the case to the trial court for consideration in conformity with this dissent.

LEIBSON, J., joins in this dissent.

LEIBSON, Justice, dissenting.

I join the Dissenting Opinion by Chief Justice Stephens.

Further, I dissent from the conclusion stated in the Majority Opinion that the hearsay testimony provided by Ms. Barlow–Elliott, the clinical psychologist, was admissible under the exception to the hearsay rule stated in Fed.R.Evid. 803(4) and *Drumm v. Commonwealth,* Ky., 783 S.W.2d 380 (1990). It was not.

The Majority Opinion suggests only that a "hardened cynic" would attribute police investigation as the reason Det. Carr took this child to Ms. Barlow–Elliott for an examination. On the contrary, I suggest only a cynic could read this record and conclude this child was taken to Ms. Barlow–Elliott for any other reason but to strengthen the case. Certainly a fair reading of the record suggests that was the sole reason for the initial consultation. Ms. Barlow–Elliott testified the child was referred to her in the hope that by "seeing a therapist who is trained to interview children who had been traumatized that perhaps he would be able to explain what happened to him." Her comment that she would also be able to evaluate what his treatment needed to be does not alter the hearsay characteristic of this evidence.

The misuse of *Drumm v. Commonwealth, supra,* to justify admitting this evidence sets a bad precedent for future cases.