**Fred Lee COLVARD, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

**No. 2007–SC–000477–MR.**

Supreme Court of Kentucky.

March 18, 2010.

As Corrected April 9, 2010.

Rehearing Denied May 20, 2010.

Cicely Jaracz Lambert, Assistant Appellate Defender, Louisville, KY, Counsel for Appellant.

Jack Conway Attorney General, Julie Scott Jernigan, Assistant Attorney General, Office of the Attorney General, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice VENTERS.

Appellant, Fred Colvard, was convicted by a Jefferson Circuit Court jury of one count of first-degree sodomy, two counts of first-degree rape, one count of first-degree burglary, and of being a second-degree persistent felony offender (PFO II). For these crimes, Appellant was sentenced to life imprisonment. Appellant now appeals to this Court as a matter of right. Ky. Const. § 110.

Among other things, Appellant argues on appeal that certain testimony from medical personnel was improperly admitted through the hearsay exception under KRE 803(4). Because we find that our previous interpretation of the hearsay exception for "statements for purposes of medical treatment or diagnosis" was too broad, we find that the testimony was inappropriate. In addition, several other hearsay statements from other witnesses were improperly admitted. Because, in combination, the errors were not harmless, we reverse Appellant's conviction and remand this matter for a new trial. We will address Appellant's other arguments which may arise in his new trial to provide guidance to the trial court.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 2, 2006, Appellant allegedly sexually assaulted two girls, D.J. and D.Y., in their bedroom. D.J. and D.Y. were six and seven years old, respectively, at the time of the events. Appellant knew the children because not only did he live in the same apartment complex as them, but just a few months before, he was engaged to marry their grandmother. The grandmother ended the engagement when she learned that Appellant was convicted of attempting to rape a ten-year-old girl in 1994.

When D.J. and D.Y. told their mother that they had just been sexually assaulted by Appellant, she immediately reported it to the authorities. The girls were then medically examined and interviewed by several medical professionals. The medical examinations turned up no DNA or other physical evidence connecting Appellant to the crime. However, the examinations were not inconsistent with the girls' allegation of sexual assault.

A jury trial was conducted and the jury found Appellant guilty of two counts of first-degree rape, one count of first-degree sodomy, and one count of first-degree burglary. He was also convicted of PFO II and the jury recommended sentences of twenty years for the burglary and life on each of the sex offenses. Those sentences were all enhanced to life imprisonment as a result of the PFO II conviction. Additional facts will be developed further below, as needed.

## I. HEARSAY TESTIMONY WAS IMPROPERLY ADMITTED UNDER KRE 803(4); EDWARDS V. COMMONWEALTH IS OVERRULED

Jennifer Polk, Dr. Cole Condra, and Dr. Lisa Pfitzer are medical personnel who testified at trial that the victims identified

Colvard as the perpetrator of the crimes committed against them. Because the testimony of each of these medical personnel implicates KRE 803(4)[1] and the ongoing viability of the extension of that rule created in *Edwards v. Commonwealth*, 833 S.W.2d 842 (Ky.1992) (overruled on other grounds by *B.B. v. Commonwealth*, 226 S.W.3d 47 (Ky.2007)), we consider Colvard's allegations of error as it relates to these medical witnesses together.

### A. Jennifer Polk

Polk, an EMT who responded to the emergency call, was called by the Commonwealth to testify about the events of March 2, 2006. Over Colvard's objection, Polk was allowed to testify that the first child to whom she spoke said that "Fred from number seven [Appellant] . . . stuck his 'dick' in her." Polk also testified that the second child to whom she spoke told her, in substance, that Appellant had "hurt" her anus. Appellant timely objected to the testimony, but the trial court overruled the objection upon the basis that it was admissible under KRE 803(4).

### B. Dr. Condra

Appellant argues that Dr. Condra improperly gave testimony about statements DJ made to the triage nurse at the hospital. Dr. Condra testified from notes made by the nurse on March 2, 2006, when the children were initially admitted into the hospital for evaluation. Among other things, Dr. Condra testified that D.J. told the triage nurse that Appellant sexually abused her. He also testified that D.J. told the nurse that "Fred has been f* * *ing her, putting his weenie in her private parts."

Dr. Condra also testified that D.J. and D.Y. informed him that they were sexually assaulted that day "and over the past months."[2]

### C. Dr. Pfitzer

Appellant argues that Dr. Pfitzer, a treating pediatrician providing follow-up examination and treatment to D.Y. and D.J., should not have been permitted to testify as to the medical history provided by G.W., the girls' mother. Appellant timely objected to the evidence, but his objection was overruled.

Dr. Pfitzer testified that she saw the children as a result of sexual abuse allegations made against "a neighbor" named "Fred" and that the allegations involved vaginal and anal penetration. Dr. Pfitzer also testified that D.J.'s mother reported that D.J. told her that "Fred was f* * *ing us."

### D. KRE 803(4) and Edwards v. Commonwealth

▮ As previously noted, the testimony of these medical personnel implicates KRE 803(4), the medical diagnosis exception to the hearsay rule. KRE 803(4) provides that "[s]tatements made for purposes of medical treatment or diagnosis and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment or diagno-

---

1. KRE 803 provides in pertinent part: "The following are not excluded by the hearsay rules . . . (4) Statements for purposes of medical diagnosis or treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

2. Based upon this testimony Appellant moved for a mistrial for failure of the Commonwealth to give notice of its intent to introduce prior acts pursuant to KRE 404(c). The motion was denied.

sis" are not excluded by the hearsay rule even though the declarant is available as a witness. However, the general rule is that the identity of the perpetrator is not relevant to treatment or diagnosis. *Souder v. Commonwealth,* 719 S.W.2d 730, 735 (Ky. 1986) (overruled on other grounds by *B.B.,* 226 S.W.3d at 47).

However, in *Edwards,* this Court recognized an exception to the identification rule in cases where a family or household member is the perpetrator of sexual abuse against a minor of that household. *See also J.M.R. v. Commonwealth of Kentucky, Cabinet for Health and Family Services,* 239 S.W.3d 116 (Ky.App.2007) (applying exception). In *Edwards,* we relied on *United States v. Renville,* 779 F.2d 430 (8th Cir.1985), as persuasive authority for the family, or household member, exception to the general rule. Therein, we acknowledged:

> In *Renville,* the Court made this exception to the general rule that physicians rarely have reason to rely on statements of identity because of two important aspects involved in the case: (1) the physician was not merely diagnosing and treating the child/patient for physical injuries but psychological injuries as well, and (2) the abuser was a *family,* household member.
>
> The physician in that case testified that he was treating the child for her emotional and physical trauma. He also said that the identity of the abuser was extremely important to him in helping the child work through her problems. The identity was also particularly important if the abuser lived with the child, because the abuse would likely continue as long as the child remained in the household with the abuser.

*Edwards,* 833 S.W.2d at 844 (citing *Renville,* 779 F.2d at 438).

The Commonwealth, citing the Court of Appeals' unpublished opinion *Plotnick v. Commonwealth,* No.2007–CA–000160–MR, 2008 WL 162881 (Ky.App. Jan.18, 2008), argues that this exception applies since the children may have considered Appellant a member of the family or household, as Appellant had only recently ended his relationship with their grandmother. Therefore, if Appellant is treated as a family or household member, and the perpetrator's identity is necessary for purposes of medical treatment, then the *Edwards* exception to the general rule would apply, allowing Polk's testimony about the origin of the children's injuries to be properly admitted under KRE 803(4) as statements reasonably pertinent to D.J.'s and D.Y.'s treatment or diagnosis.

Upon reconsideration of the plain language of KRE 803(4) and its underlying purpose, we have come to the view that the identification exception we adopted in *Edwards* and the Court of Appeals applied in *J.M.R.* were based upon an ill-advised and unsound extension of a traditional exception to the hearsay rule. We accordingly overrule *Edwards* and *J.M.R.*

The hearsay rule developed over hundreds of years of Anglo–American experience in jury trials. That jurisprudential experience taught that statements of witnesses repeating what they had heard from others out of court was inherently unreliable and unworthy of belief. To protect the integrity of the trial and its truth—finding mission, such out-of-court statements were forbidden. We also learned, however, that certain kinds of out-of-court statements, because of the circumstances in which they were uttered, were highly reliable.

> [Hearsay evidence] was later excluded for lack of oath and cross-examination, two devices for assuring trustworthiness, of which the latter is primary and

came finally to be controlling. There-fore, the hearsay rule and its exceptions in outline, though not in detail, form a logically coherent whole. Each exception is justified, for the hearsay received thereunder was uttered with attendant conditions which furnish a sufficient guaranty of its trustworthiness to enable the jury to value it.

*See* Edmund M. Morgan and John MacArthur Maguire, *Looking Backward and Forward at Evidence,* 50 Harv. L.Rev. 909, 920–921 (1937).

Among the several exceptions to the hearsay rule that developed is the one now codified as KRE 803(4), "statements for purposes of medical treatment or diagnosis."

We know that an ill or injured person seeking to be healed or cured is ordinarily highly motivated to give truthful information to the physician or medical provider treating that illness or injury. The essential element that lends credence to the statement is that the patient, the "declarant" in hearsay law parlance, believes that the doctor must have that information to render effective treatment. The doctor's actual need, use, or reliance upon the declarant's information is less meaningful than the declarant's belief that the information is essential to effective treatment. The declarant's belief makes the out-of-court statement inherently trustworthy.

■ As expressed in *Willingham v. Crooke,* 412 F.3d 553, 561–562 (4th Cir. 2005):

Rule 803(4) of the Federal Rules of Evidence [the federal counterpart of KRE 803(4) ] allows the admission of hearsay statements "made for purposes of medical diagnosis or treatment and describing ... present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." This exception to the hearsay rule is premised on the notion that a declarant seeking treatment "has a selfish motive to be truthful" because "the effectiveness of medical treatment depends upon the accuracy of the information provided." 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 803.06[1] (Joseph M. McLaughlin, ed., 2d ed.2004); *see Morgan v. Foretich,* 846 F.2d 941, 949 (4th Cir. 1988). Admissibility of a statement pursuant to Rule 803(4) is governed by a two-part test: "(1) the declarant's motive in making the statement must be consistent with the purposes of promoting treatment; and, (2) the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis." *Morgan,* 846 F.2d at 949.

(internal quotation marks & footnote omitted).

Hence, we except from the hearsay rule statements made by a patient to medical personnel for the purpose of medical treatment or diagnosis. In the *Edwards* case, we enlarged that exception to include statements of a patient identifying the perpetrator of sexual abuse when that perpetrator is a member of the family or household of the victim, not because the utterance of the statement was motivated by the victim's desire for effective treatment, but because the medical professional might use that information to protect the victim from further abuse by a member of the victims family or household. *Edwards,* 833 S.W.2d at 844. In so doing, we failed to recognize that it is the patient's desire for treatment, not the doctor's duty to treat, that gives credibility to the patient's out-of-court statement. There is no inherent trustworthiness to be found in a hearsay statement identifying the perpetrator

when that statement did not arise from the patient's desire for effective medical treatment. As Professor Lawson notes, in Section 8.55(6) of the *Kentucky Evidence Law Handbook* (4th ed.2003) (quoting Mueller & Kirkpatrick, *Federal Evidence*, § 442 (2d ed. 1994)): "(T)his expansion [the *Edwards/Renville* decisions] of the exception is troubling ... admitting such statements because doctors rely on them in diagnosis is highly questionable."

The *Renville* rule has also received other scholarly criticism. *State v. Jones*, 625 So.2d 821, 825 (Fla.1993), for example, sets forth learned authorities which criticize the rule and the reasonings therefor:

> However, the trend to adopt a *Renville*—type analysis also has been harshly criticized. As the Maryland Court of Special Appeals noted in a scholarly opinion:
>
> > In stretching outward their list of a physician's responsibilities and in pushing forward with their definition of "medical treatment and diagnosis," the expansionists have left behind, abandoned and forgotten, the state of mind of the declarant.... Physical self-survival dictates revealing even embarrassing truth to avoid the risk of the wrong medicine or the needless operation. Presupposing a declarant conscious of the probable consequences of his assertions, the imperative to speak truthfully is not nearly so strong when the anticipated result is a social disposition. The temptation to influence the result may, indeed, run in quite the opposite direction. Truthful answers as to the identity of its abuser may well wrench a child from the reassuring presence of its mother or father or both. It is highly unlikely that there operates in an infant declarant a compelling desire to bring about such a result. *Cassidy v.*

*State*, 74 Md.App. 1, 536 A.2d 666, 684 (1988), cert. denied, 312 Md. 602, 541 A.2d 965 (1988).

Moreover, many commentators have expressed concern that in the course of laudable efforts to combat child abuse, prosecutors, courts, and others have occasionally overreached. See, e.g., Michael H. Graham, *The Confrontation Clause, the Hearsay Rule, and Child Sexual Abuse Prosecutions: The State of the Relationship*, 72 Minn.L.Rev. 523, 529 n. 26 (1988) ("The successful prosecution of child sexual abuse cases should not be permitted to distort the hearsay exception for statements for medical diagnosis or treatment. Almost anything is relevant to the diagnosis or treatment of psychological well being, and far too many untrustworthy statements are relevant to preventing repetition of the abuse."); Robert P. Mosteller, *Child Sexual Abuse and Statements for the Purpose of Medical Diagnosis or Treatment*, 67 N.C.L.Rev. 257, 258 (1989) (Applications of medical diagnosis or treatment exception in child abuse cases "have tended to expose the thinness of the justification for extending the exception to statements made without any view toward treatment.")

As reflected by the foregoing discussion, we have carefully considered the *Renville* rule, its merits and de merits, and now conclude that our adoption of the rule was an unwise departure from the traditional hearsay rule that has served our system of justice well for many generations. One cannot reasonably conclude that the statements identifying the perpetrator, such as those at issue in this case, were made by young children "for the purpose of medical treatment or diagnosis." The *Renville* rule is inconsistent with the plain language of KRE 803(4), and, as the above authorities explain, the

reliability of a child's identification of the perpetrator of the abuse to a medical professional contains the same tangible risks of unreliability generally inherent in all hearsay testimony. Accordingly, *Edwards*, *J.M.R.*, and other cases applying the exception to the hearsay rule are overruled. In so deciding, we do not hold that statements of a child victim to medical personnel identifying an abuser are always inadmissible. There may be circumstances in which such statements will be found to comport with the requirements of KRE 803(4) or other exceptions to the hearsay rule. This, however, is not such a case.

Based upon the above discussion, we conclude that it was error for the trial court to have permitted Polk, Dr. Condra, and Dr. Pfitzer to testify under the *Renville* construction of the medical treatment exception to the hearsay rule.[3] Moreover, because the testimony served to bolster the children's testimony and the Commonwealth's theory of the case, the testimony was highly prejudicial. As further discussed below, in combination with other inadmissible hearsay statements let into trial, reversible error occurred.

■ This opinion does not alter or limit the traditional hearsay exception allowing medical providers to testify to a patient's out-of-court statements as to what was done to the patient and how he or she was injured. Nor, as the dissent implies, does this opinion impede or limit the ability of medical personal to report suspected child abuse, including information regarding the identity of a suspected abuser to the ap-

propriate authorities. We simply state that we no longer recognize a special exception to the hearsay rule which allows medical providers to testify in court to the hearsay statements of a victim of sexual offenses which identify the alleged perpetrator because that identification is not pertinent to the medical treatment being provided.

## II. OTHER HEARSAY TESTIMONY

In addition to the medical testimony hearsay discussed above, Appellant also complains of hearsay statements introduced at trial through J.W., the victims' uncle; G.W., the victims' mother; and Valleri Mason, a children's forensic interviewer. For the reasons stated below, we conclude that each of these witnesses was permitted to repeat statements made by the children identifying Appellant as the perpetrator, and that the statements were not subject to any hearsay exception.

### A. J.W.—(Victims' Uncle)

■ Appellant argues the trial court erred by permitting testimony from the victims' uncle, J.W. The uncle, a prosecution witness, testified that he asked D.Y. "what happened, who touched her," and D.Y. pointed to Appellant. Appellant objected, claiming the testimony was hearsay, but the trial court determined the uncle was being asked about what he said and saw, not what a third-party said, and allowed him to testify to his recollection.

KRE 801 defines a statement as: "(1) An oral or written assertion; or (2) *Non-*

---

**3.** Even under the *Renville* rule it would have been error to have admitted Polk's testimony. Polk, as an EMT, was treating D.J. and D.Y. for purely physical injuries, without addressing the emotional/psychological trauma. An emergency medical responder, unlike a treating physician ordinarily does not have the medical training, or the expertise, to engage

in, or plan for, psychological evaluation and treatment. Thus, the identity of the perpetrator is not something an EMT would reasonably rely upon in composing a course of emergency treatment. Thus, the *Edwards* and *Renville* exception was inapplicable in this instance.

*verbal conduct of a person, if it is intended by the person as an assertion."* (Emphasis added). We have no difficulty in concluding that D.Y.'s nonverbal conduct pointing at Appellant following J.W.'s question was the equivalent of a verbal assertion by D.Y. that "Fred Colvard touched me." Thus, the nonverbal assertion falls under the normal hearsay rules for the admission of evidence.

In support of the statement's admission, the Commonwealth cites us to KRE 801A(a)(3), *Preston v. Commonwealth,* 406 S.W.2d 398, 403 (Ky.1966), and our previous ruling in *Owens v. Commonwealth,* 950 S.W.2d 837, 839 (Ky.1997), to the effect that "once a witness is allowed to testify that he made an identifying statement, further proof by other witnesses that he did in fact make it is just as relevant and competent as would be defensive proof to the effect that he did not make it." (internal citations omitted).

KRE 801A(a)(3) provides as follows:

Prior statements of witnesses. A statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the declarant testifies at the trial or hearing *and is examined concerning the statement, with a foundation laid as required by KRE 613,* and the statement is: ... (3) One of identification of a person made after perceiving the person.

(emphasis added).

While D.Y. did testify at trial, the Commonwealth fails to cite us to D.Y.'s testimony wherein she was "examined concerning the statement" she made to her uncle, and our review of the testimony discloses no such examination of the child. Nor do we find compliance with the foundation requirements contained in KRE 613. Further, the uncle testified prior to D.Y. Accordingly, the elements for admissibility under the rule are not met, and the uncle's testimony relating the statement was admitted in error.

### B.   G.W.—(Victims' Mother)

At trial, Appellant asked the children's mother on cross-examination whether she had asked the children "Did he put his dick in you?" The apparent purpose of the question was to impeach the mother by portraying her as vulgar. Appellant then had the mother read a report prepared by Polk that stated that the mother had, in fact, asked the children that question.

On redirect, the Commonwealth attempted to ask the mother about a statement made by D.Y. to Polk to the effect that Appellant "took his weenie out of his zipper and put it in her, but not all the way." The Commonwealth first attempted to argue that the statement was admissible as a statement made for medical diagnosis under KRE 804(a) as extended under *Edwards.* The trial court ultimately ruled that the question and answer could come in for the purpose of showing that the children used "children's" terminology as opposed to the vulgar terminology allegedly used by the mother.

Appellant now claims that allowing the mother to so testify improperly bolstered the victims' testimony. We agree.

While Appellant's inquiry of the mother about her question to the children opened the door to further inquiry regarding that event, and perhaps other conversations she had with the children, we fail to perceive how that would have opened the door for the mother to repeat D.Y.'s statement to Polk. Because D.Y. used children's terminology does not impeach the mother's denial that she asked the children a question using vulgar terminology. Moreover, the purported impeachment was impeachment on a collateral matter that permitted a hearsay statement not subject to an excep-

tion implicating Appellant as guilty of the charges to be heard by the jury.

The mother's questioning of the children is too attenuated from D.Y.'s statement to Polk for questioning concerning the former to have opened the door to the latter. We discern no other hearsay exception which would have permitted the statement to be admitted, and accordingly conclude that it was admitted in error.

### C. Valleri Mason

■ Lastly, Appellant objects to various statements made by Valleri Mason, a forensic interviewer for Family and Children First.[4] Mason, a self-described child interview specialist, interviewed D.Y. and D.J. the day after the reported assault and testified about that interview at trial. She testified that D.Y. and D.J. made disclosures of sexual abuse and that they circled anatomically correct drawings indicating where they had been violated. In addition, she testified to the following discussion she had with D.J.:

> You told me that Fred, that he put his peanuts [D.J.'s term for penis] in you. She said, "Yeah." I said, well can you show me on here. Does this boy, does he have peanuts? She said, "yes" .... I asked her to circle where the peanuts are on that boy and she circled the penis.

■ Though Mason's title is that of a "forensic interviewer," she is, in effect, a social worker. "It is well-settled that '[t]here is no recognized exception to the hearsay rule for social workers or the results of their investigations.'" B.B., 226 S.W.3d at 51. It follows that there is no hearsay exception which would allow Mason to testify to the children's identification of Appellant as having sexually assaulted them.[5]

As with the medical testimony, the above hearsay was prejudicial because the testimony served to bolster the children's testimony and the Commonwealth's theory of the case. As further discussed below, in combination with the medical hearsay statements admitted into evidence at trial, reversible error occurred.

### III. THE HEARSAY ERRORS WERE NOT HARMLESS

■ RCr 9.24 requires us to disregard an error if it is harmless. A nonconstitutional evidentiary error may be deemed harmless if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error. Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). The inquiry is not simply "whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." Id. at 765, 66 S.Ct. 1239; Winstead v. Commonwealth, 283 S.W.3d 678, 688–89 (Ky.2009).

4. Appellant also objects to Mason's testimony that D.J. stayed on task better, followed questioning, and was less easily distracted than D.Y., her older sister; her testimony that she had not testified as a witness in court for each interview she has done, because not all cases go to court; and her testimony that she does not make recommendations to the prosecutor, that some cases settle, and sometimes the touching alleged is not illegal or improper touching.

5. This claim of error was not properly preserved by objection. We have factored this into our harmless error review in considering whether reversible error occurred as a result of the multiple recitations of impermissible hearsay identifying Appellant as having perpetrated a sexual assault on the children.

In light of the lack of DNA or other physical evidence linking Appellant to the crimes, the multiple instances of hearsay testimony described above which bolster the Commonwealth's theory was of sufficient consequence such that we cannot say with fair assurance that the judgment was not substantially swayed by the error. The improper hearsay evidence vouching that the children had previously identified Appellant as the perpetrator multiplied the bolstering effect and resulted in a parade of witnesses vouching for the Commonwealth's theory of the case.

In sum, we are persuaded that the multiple instances of hearsay evidence bolstering the Commonwealth's case were not harmless error. We accordingly are constrained to vacate the trial court's judgment of conviction, and remand for a new trial.

## IV. EVIDENCE REGARDING APPELLANT'S PRIOR CONVICTION IS ADMISSIBLE

Appellant contends that the trial court erroneously permitted the Commonwealth to introduce evidence that he was convicted of attempting to rape a ten-year old child in 1994. Because the issue is likely to arise again upon retrial, we address the argument on the merits.

At trial, the Commonwealth introduced evidence that Appellant was convicted of attempting to rape a ten-year old girl in 1994. The victim, who is now twenty-three years old, testified at trial. Appellant argues that this testimony was error per KRE 404(b) because the circumstances surrounding the 1994 conviction were too dissimilar to the instant case. Generally, a defendant's prior bad acts are inadmissible. However, KRE 404(b)(1) provides that evidence of prior crimes or wrongs is admissible if offered for "proof of motive, opportunity, intent, preparation, plan,

knowledge, identity, or absence of mistake or accident." As recognized in *Tamme v. Commonwealth*, 973 S.W.2d 13, 29 (Ky. 1998), this list of exceptions is illustrative, not exclusive. "Among the non-enumerated exceptions we have recognized to KRE 404(b)'s general prohibition on the introduction of prior bad acts evidence is ... *modus operandi*" *Clark v. Commonwealth*, 223 S.W.3d 90, 95 (Ky.2007). The modus operandi exception requires that:

> [t]he facts surrounding the prior misconduct must be so strikingly similar to the charged offense as to create a reasonable probability that (1) the acts were committed by the same person, and/or (2) the acts were accompanied by the same *mens rea.* If not, then the evidence of prior misconduct proves only a criminal disposition and is inadmissible.

*Id.* (citing *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999)).

> "It is not the commonality of the crimes but the commonality of the facts constituting the crimes that demonstrates *modus operandi* So, as a prerequisite to the admissibility of prior bad acts evidence, we now require that the proponent of the evidence to 'demonstrate that there is a factual commonality between the prior bad act and the charged conduct that is simultaneously similar and so peculiar or distinct that there is a reasonable probability that the two crimes were committed by the same individual.' Thus, '[a]lthough it is not required that the facts be identical in all respects, 'evidence of other acts of sexual deviance ... must be so similar to the crime on trial as to constitute a so-called signature crime.' "

*Id.* at 97.

The circumstances of the present offenses are sufficiently similar to the 1994 crime to satisfy the standard we have established for admission under KRE 404(b).

The prior offense indicated a sexual interest in prepubescent girls, such as the victims here. In both the prior crime and the current offenses, Appellant knew the victims and gained access to their homes by his involvement in a romantic relationship with an adult female in the household. All of the victims had second floor bedrooms and were quietly assaulted while others were in the home. The nature of the sexual act itself was similar in that each incident was of brief duration, the perpetrator said nothing to the victim during the assault, the perpetrator did not ejaculate, and avoided vaginal or anal tearing of the victims by penetrating only partially.

Faced with those striking similarities between Appellant's prior conviction and the current alleged crimes, the trial court did not abuse its discretion in admitting under KRE 404(b) the evidence of Appellants prior conviction for attempted rape. At retrial, should the same facts be developed, the trial court will be well within its discretion to admit evidence regarding Appellant's prior conviction.

## V. THE BURGLARY INSTRUCTION GIVEN TO THE JURY WAS ERRONEOUS

Finally Appellant argues that the jury instruction given on the burglary charge was improper because it allowed the jury to convict him of that crime if they believed he either caused physical injury to the girls, a violation of KRS 511.020(1)(b), or threatened the girls with harm to their mother if they told anyone about what he did. KRS 511.020(1)(c). We address the issue because it may arise upon retrial.

Appellant argues that the instruction as written presented alternate theories of guilt, violating his right to a unanimous verdict. A jury instruction which presents an alternative theory of guilt is proper and does not violate the requirement of unanimity found in Section 7 of the Kentucky Constitution, if every alternate theory contained in the instruction was reasonably supported by evidence presented at trial. *Hayes v. Commonwealth*, 625 S.W.2d 583, 584 (Ky.1981).

While alternative theories of criminal liability may properly be combined in a single instruction, the instruction must accurately present the elements of each alternative theory. Guilt under KRS 511.020(1)(c) requires that one "uses or threatens the use of a dangerous instrument against any person who is not a participant in the crime." The corresponding instruction given by the trial court stated that Appellant could be found guilty of first degree burglary if, among the other elements, he "threatened to kill the victim's mother, [G.W.]." It is clear that the instruction does not accurately reflect the requirement of the statute. If upon retrial, the Commonwealth pursues a conviction on the alternate theories of liability under KRS 511.020(1)(b) and (1)(c), and appropriate evidence is offered to support same, the instruction must correspond to the statutory element by requiring the jury to find, not simply a threat to kill another, but a threat to use a deadly weapon against another person.

## VI. OTHER ISSUES

Appellant also argues that prejudicial error occurred by the trial court's failure to strike two jurors for cause. Because the case is reversed on other grounds and the issue is unlikely to recur upon retrial, we decline to address it.

Appellant also argues that the evidence presented at trial was insufficient to support the convictions. We disagree. The testimony of D.J. and D.Y. describing the events of March 2, 2006, and identifying Appellant as the perpetrator was suffi-

cient to defeat his motion for a directed verdict. *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991). The trial court did not err in overruling Appellant's motions for directed verdicts.

## CONCLUSION

For the reasons stated herein, the judgment of the Jefferson Circuit Court is reversed, and the cause is remanded for additional proceedings consistent with this opinion.

All sitting. CUNNINGHAM, NOBLE, and SCHRODER, JJ., concur.

MINTON, C.J., concurs in part and dissents in part and would not allow introduction of 1994 attempted rape conviction because the facts of the current case are not sufficiently similar to satisfy KRE 404(b). He concurs in all other respects.

SCOTT, J., concurs in part and dissents in part by separate opinion in which ABRAMSON, J., joins.

SCOTT, Justice, Concurring in Part and Dissenting in Part Opinion:

Although I concur with the majority on the other issues, I must respectfully dissent from the majority's opinion that this Court's decision in *Edwards v. Commonwealth,* 833 S.W.2d 842 (Ky.1992) (*overruled on other grounds by B.B. v. Commonwealth,* 226 S.W.3d 47 (Ky.2007)) was "based upon an ill-advised and unsound extension of a traditional exception to the hearsay rule." Op. at 244.

### I. Edwards and Renville

*Edwards, id.* at 844, was premised on *United States v. Renville,* 779 F.2d 430 (8th Cir.1985), wherein the logic of the rule as applied to young children was explained, to wit:

Statements by a child abuse victim to a physician during an examination that the abuser is a member of the victim's immediate household *are* reasonably pertinent to treatment.

Statements of this kind differ from the statements of fault ... and properly excluded under our past decisions in a crucial way: they are reasonably relied on by a physician in treatment or diagnosis. First, child abuse involves more than physical injury; the physician must be attentive to treating the emotional and psychological injuries which accompany this crime. The exact nature and extent of the psychological problems which ensue from child abuse often depend on the identity of the abuser. The general rule banning statements of fault is premised on the assumption that the injury is purely somatic. This is evident from the examples put forth by the courts and commentators discussing the rule. In each example, the medical treatment contemplated was *restricted* to the physical injuries of the victim; there is no psychological component of treatment which could relate to the identity of the individual at fault. Furthermore, *in each example the statement of fault is not relevant to prevention of recurrence of the injury.* Sexual abuse of children at home presents a wholly different situation.

Second, physicians have an obligation, imposed by state law, to prevent an abused child from being returned to an environment in which he or she cannot be adequately protected from recurrent abuse. This obligation is most immediate where the abuser is a member of the victim's household, as in the present case. Information that the abuser is a member of the household is therefore "reasonably pertinent" to a course of treatment which includes removing the child from the home.

*Id.* at 436–438 (internal citations and footnotes omitted); *see also J.M.R. v. Commonwealth of Kentucky, Cabinet for Health and Family Services,* 239 S.W.3d 116 (Ky.App.2007).

As our predecessor Court noted in *Edwards:*

> In *Renville,* the Court made this exception to the general rule that physicians rarely have reason to rely on statements of identity because of two important aspects involved in the case: (1) the physician was not merely diagnosing and treating the child/patient for physical injuries but psychological injuries as well, and (2) the abuser was a *family,* household member.
>
> The physician in that case testified that he was treating the child for her emotional and physical trauma. He also said that the identity of the abuser was extremely important to him in helping the child work through her problems. The identity was also particularly important if the abuser lived with the child, because the abuse would likely continue as long as the child remained in the household with the abuser.

833 S.W.2d at 844. And, as was noted by the Court in *J.M.R.:*

> The therapists testified that the boys feared their stepfather would harm them in the future and that they did not want to reunify with their mother because of her inability or unwillingness to leave their stepfather. While the mother contends that these statements were inadmissible hearsay, we conclude that these statements qualified as hearsay exceptions pursuant to KRE 803(4) because the statements were made to therapists who were determining what happened to the children and what treatment they needed to receive and the statements were made for the purpose of receiving medical treatment.

239 S.W.3d at 119 –120; *see also Gadd v. Commonwealth,* 2005–SC–000880–MR, 2007 WL 858811 (Ky.2007). *Gadd,* in turn, led to an expansion in *Plotnick v. Commonwealth,* 2007–CA–000160–MR, 2008 WL 162881 at *3 (Ky.App.2008), wherein the Court recognized:

> While not a "family member" in the traditional sense, D.R. called Plotnick "daddy," D.R. had a half-sibling fathered by Plotnick, D.R. had resided with Plotnick at times, and the victim's mother had an ongoing relationship with Plotnick from which it may be inferred that there would be ongoing contact between the victim and the alleged perpetrator. Therefore, we believe the *Edwards* exception applies, and that the physician's assistant properly repeated D.R.'s identification of Plotnick as the perpetrator.

Each of these opinions are based on common ground—that it is medically relevant to the health and safety of young children that their injuries not only be recognized and treated, but also that further injury prevented—i.e., their perpetrators, if connected with the children's home life, could be identified and reported so that the child would be made safe.

Moreover, even *State v. Jones,* 625 So.2d 821, 824–25 (Fla.1993), upon which the majority bases its logic, admits that "[t]he *majority* of state courts confronted with this issue have followed *Renville* and permitted medical personnel to testify regarding statements of identity made by child victims of abuse." *Id.* at 824–25 (emphasis added) (citations omitted).

## II. The Occurrence

The relevant events precipitating this analysis occurred on March 2, 2006, in Louisville, Kentucky, when the victims, D.J. and D.Y., were six and seven years old, respectively. That day, their mother,

G.W., met them as they got off the school bus and was told by the bus driver that the girls had misbehaved on the trip home. She then took them home, ordering them to their room and bed as punishment for their behavior on the bus. G.W., who was seven months pregnant at the time, then went to the kitchen to fix her daughters a snack, but became ill and went to the bathroom.

During this time, Appellant entered the home and went to D.Y. and D.J.'s bedroom. D.J. testified that Appellant climbed onto the top bunk where she was lying and used belts to tie her arms and legs to the bed. He then hit her in the face and raped her. Though D.J. could not remember what he said, Appellant threatened her. In addition, Appellant raped D.Y. He told D.Y. that he would kill her mother and the baby her mother was carrying if she told anyone what he was doing. Appellant then climbed out the window.

While in the bathroom, G.W. heard a door close and shouted to her daughters, asking who was in the house. D.Y., the older of the two victims, then asked to come into the bathroom to wash herself. D.Y. initially refused to tell her mother why, but she was holding herself. On undressing her, G.W. noticed that D.Y.'s vagina was red, and had a strong odor. G.W. then went to her daughter's room and noticed an odor of feces. After briefly questioning the children, G.W. realized that both her daughters had been raped. At her insistence, both girls identified Appellant as their attacker.

G.W. then looked out the window and saw Appellant leaving. She grabbed a butcher knife from the kitchen, left the apartment, and confronted Appellant. Initially, he denied the allegations, but became silent when G.W.'s mother, W.D.,

Appellant's former fiancee, confronted and physically attacked him.

The police and EMS were then called to G.W.'s apartment. No injuries or blood was seen on the girls and EMS left the scene. G.W. and W.D. then took the girls to the hospital. Dr. Condra, who saw the children at the hospital, testified that D.J.'s examination showed some mild redness between the vulva and vagina, but there was no evidence of tears or bruising to the vagina. An abnormality of the hymen was also noted. Dr. Condra concluded that D.J.'s examination was consistent with her complaint of sexual assault and was consistent with some type of penetration, although he could not specify the nature of the penetration.

D.Y.'s examination showed some mild redness or inflammation at the opening of the vagina, but there were no tears or bruising. The history D.Y. gave Dr. Condra, along with his examination, was consistent with a sexual assault. D.Y. also had anal dilatation of about 1.5 centimeters. Such a dilatation was consistent with a penetrating trauma.

Vaginal swabs, anal swabs, and a vaginal smear of the panties did not disclose the presence of any seminal fluid or sperm cells on D.J. or D.Y. However, an unidentified 11–inch, light brown, Caucasian head hair was found in D.Y.'s anal region that did not belong to Appellant, an African–American. No semen, pubic hair or body hair was found on any of the bed clothing or the towel removed from the girl's bedroom. Rape kits taken from the children did not contain any semen that could be examined or analyzed as Appellant had not ejaculated.

### III. The Medical Testimony

#### A. Dr. Condra

Prior to seeing Dr. Condra at the hospital, D.J. and D.Y. were interviewed by the

triage nurse. Dr. Condra relied upon these notes in treating the victims. The notes reflected that D.J. told the triage nurse that Appellant sexually abused her. Dr. Condra also testified that D.J. told him and the nurse what Appellant had been doing to her. He also testified that both D.J. and D.Y. informed him that they were sexually assaulted that day "and over the past months."

### B. Dr. Pfitzer

Dr. Pfitzer was a treating pediatrician who provided follow-up examination and treatment to D.J. and D.Y. She testified that she saw the children as a result of sexual abuse allegations made against "a neighbor" named "Fred" and that the allegations involved vaginal and anal penetration.

### IV. The Majority's Departure From Edwards

In discarding *Edwards'* precedent of eighteen years, the majority asserts that it "cannot reasonably conclude that the statements identifying the perpetrator, such as those at issue in this case, were made by young children 'for the purpose of medical treatment or diagnosis.'" Op. at 246. The majority further asserts "the reliability of a child's identification of the perpetrator of the abuse to a medical professional contains the same tangible risk of unreliability generally inherent in all hearsay testimony." *Id.* at 246–47. Outside the medical field, one could assert this conclusion to be valid as long as it rested "on the obvious assumption that the declarant is responding under the impression that [he or she] is being asked to make an accusation that is not relevant to the physician's diagnosis or treatment." *Renville,* 779 F.2d at 438. However,

> [t]his assumption does not hold where the physician makes clear to the victim

that the inquiry into the identity of the abuser is important to diagnosis and treatment, and the victim manifests such an understanding. In such circumstances, the victim's motivation to speak truthfully is the same as that which insures reliability when he recounts the chronology of events or details symptoms of somatic distress.

*Id.* Here, there is nothing in the record to indicate "that the child's motive in making these statements to medical personnel was other than as a patient responding to a physician questioning for prospective treatment." *Id.* at 439 (*citing United States v. Iron Shell,* 633 F.2d 77, 84 (8th Cir.1980)); *see also U.S. v. Kappell,* 418 F.3d 550, 557 (6th Cir.2005) ("The record supports the district court's finding that 'there is sufficient indicia that these statements were made for the purpose of medical diagnosis or treatment . . . to be admissible under 803(4).'").

The reasoning for retaining the *Edwards/Renville* exception was also aptly noted by the Supreme Court of Arkansas in *Hawkins v. State,* 348 Ark. 384, 72 S.W.3d 493, 498 (2002):

> R.T.'s identification of appellant as her abuser allowed Dr. Hawawini to take steps to prevent further abuse by her stepfather, who was a member of her household. Additionally, R.T.'s identification of appellant as her abuser allowed Dr. Hawawini to take steps to treat the emotional and psychological injuries which accompanied the rape. Moreover, we note that based on R.T.'s statements, Dr. Hawawini referred her to a physician at Children's Hospital who specialized in treating children who are sexually abused. Finally, R.T.'s identification of appellant as her abuser permitted Dr. Hawawini to fulfill her legislatively imposed duty of calling the child-abuse hotline and reporting the crime.

And, the Court in *Morgan v. Foretich,* also noted that "[w]e agree with the judgment of the Eighth Circuit [in *Renville* ] that '[s]exual abuse of children at home presents a wholly different situation' from that normally encountered in Rule 803(4) cases and that situation requires great caution in excluding highly pertinent evidence." 846 F.2d 941, 949 (4th Cir.1988) (*citing Renville,* 779 F.2d at 437). In *State v. Tracy,* 482 N.W.2d 675 (Iowa 1992), the Iowa Supreme Court agreed, noting that "[b]ecause of the nature of child sexual abuse, the only direct witnesses to the crime will often be the perpetrator and the victim. Consequently, much of the State's proof will necessarily have to be *admissible* hearsay statements made by the victim to relatives and medical personnel." *Id.* at 682. Thus, " '[i]nformation that the abuser is a member of the household is therefore 'reasonably pertinent' to a course of treatment which includes removing the child from the home.' " *Id.* at 681–82 (*quoting Renville* 779 F.2d at 438); *see also State v. Robinson,* 153 Ariz. 191, 735 P.2d 801, 810 (1987) ("[I]n child sexual abuse cases, we therefore join the growing number of jurisdictions which recognize that statements regarding the abuser's identity fall within Rule 803(4) whenever, as here, identity is relevant to proper diagnosis and treatment."); *State v. Aguallo,* 318 N.C. 590, 350 S.E.2d 76, 80 (1986) ("[I]n the context of a child sexual abuse or child rape, a victim's statements to a physician as to an assailant's identity are pertinent to diagnosis and treatment."); *Goldade v. State,* 674 P.2d 721, 725 (Wyo.1983) ("[T]he function of the court must be to pursue the transcendent goal of addressing the most pernicious social ailment which afflicts our society, family abuse, and more specifically, child abuse."); *U.S. v. George,* 291 Fed. Appx. 803, 805 (9th Cir.2008) ("The district court also did not abuse its discretion by admitting D.B.'s statement to a nurse practitioner that George touched her inappropriately because the statement was made for the purposes of a medical diagnosis."); *People of Territory of Guam v. Ignacio,* 10 F.3d 608, 613 (9th Cir.1993) ("Thus, a child victim's statements about the identity of the perpetrator are admissible under the medical treatment exception *when they are made for the purposes of medical diagnosis and treatment.*") (emphasis added).

### V.   Conclusion

For these reasons, I cannot so easily cast away an exception wisely adopted by our predecessor Court for the protection of the children of Kentucky and thus I must dissent.

ABRAMSON, J., joins.