RENDERED: DECEMBER 14, 2023
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2022-SC-0385-MR

JOSE SANCHEZ                                                         APPELLANT

V.                      ON APPEAL FROM WAYNE CIRCUIT COURT
HONORABLE VERNON MINIARD, JR., JUDGE
NOS. 17-CR-00062 & 17-CR-00020

COMMONWEALTH OF KENTUCKY                            APPELLEE

**OPINION OF THE COURT BY JUSTICE LAMBERT**

**<u>AFFIRMING IN PART, REVERSING IN PART, AND VACATING</u>**

Jose Sanchez (Sanchez) was convicted of five counts of first-degree rape and four counts of third-degree rape. He now appeals his convictions and resulting sentence of seventy years' imprisonment as a matter of right.[1] After thorough review we affirm Sanchez's convictions and sentence, but we reverse and vacate the trial court's imposition of public defender fees against him.

## I.     FACTS AND PROCEDURAL BACKGROUND

The victim in this case, Jane,[2] alleged that Sanchez had repeatedly raped her over the course of several years. Sanchez had been her mother's live-in

---

[1] Ky. Const. § 110.

[2] The victim is this case was a minor when the crimes against her were committed, and we therefore refer to her using a pseudonym to protect her privacy.

boyfriend since Jane was an infant, and although he was not Jane's biological father, he was the only father figure in her life and she called him "dad."

Jane, who was twenty years old at the time of the trial, testified that her first memory of being sexually abused by Sanchez occurred when she was in kindergarten. While in the family home, Sanchez made her get on a bed with him, wrapped her in a blanket, and began touching her legs and vagina. As Jane got older the abuse continued to escalate, and he raped her for the first time when she was nine or ten years old. Jane explained that on that occasion Sanchez had taken her with him on a day trip for work because he needed her to translate; neither of Jane's parents spoke English and she frequently translated for both of them. At some point during the drive, he pulled the car over and made her get out and lay down on the ground. He took off her clothes and his pants and underwear and got on top of her. She tried to fight him off, but he was able to put his penis in her vagina.

Taking Jane on trips to abuse her became common practice. Jane testified Sanchez would pull over in different areas, referred to respectively by Sanchez as "the bridge," "the woods," "the river," and "our secret hideout," and rape her. He would also assault her in the family home during the day when no one was home or at night when everyone was asleep.

Jane's mother became very ill from chronic kidney disease sometime around 2012. Her mother was unable to work or care for Jane's younger

brothers, Adam and Ben[3].  Adam was born sometime around 2006, and Ben was born in 2014.  Jane's mother had a very difficult pregnancy with Ben due to her illness, and he was born premature with numerous health issues, including heart and lung complications that required surgical intervention.  Ben was also born with a cleft palate necessitating that he be fed with a feeding tube.  Jane stepped into a caregiving role for both her mother and her younger brothers, in particular Ben, and missed so much school doing so that she became homeschooled in the sixth grade.

During this time, the rapes continued.  Jane testified she never wanted to comply with Sanchez's demands, but if she refused him, he would withhold things from the other members of the family.  For example, he would withhold medical care for her mother and Ben, or clothing and food.  Jane was afraid to report what Sanchez was doing to her because he was the family's sole breadwinner, and she did not know how they would survive if she reported him.  Sanchez would also frequently bribe Jane with money, clothing, or the ability to go out with her friends in exchange for complying with his sexual demands.

At some point when Jane got older, Sanchez bought her a cellphone.  He would frequently text her demanding sex.  Jane testified that when she was younger, she would delete the messages he sent her because of their vile nature.  But, in 2016, fourteen-year-old Jane began to consider reporting the

---

[3] We use pseudonyms to refer to Jane's brothers as they were also minors during the events at issue.

3

abuse. She therefore stopped deleting the messages and took photographs and video recordings of Sanchez to use as evidence against him.

Jane ultimately filed a police report against Sanchez on November 29, 2016, and he was arrested the same day. While at the police station, Jane took screenshots of text messages Sanchez sent her and printed them directly to the police station's printer. Later, Jane was forensically interviewed and medically examined at a local children's advocacy center (CAC). During her forensic interview, Jane used the text messages, which ranged from June 20, 2016, to November 29, 2016, to write down the dates she believed rapes had occurred based on the content of the texts. The sheets of paper Jane used to write these dates and texts down were entered into evidence at trial. Of note, Jane stated several times that during that time Sanchez would rape her up to three days per week.

Sanchez's cellphone was confiscated by law enforcement upon his arrest, and it was later forensically searched pursuant to a search warrant by Detective Mike Littrell (Det. Littrell), a detective with the attorney general's digital forensics office. The messages extracted from Sanchez's phone were from November 19, 2016, to November 29, 2016. Of the forty-one messages extracted from Sanchez's phone exchanged between himself and Jane, twenty-two matched the messages captured by the screenshots taken from Jane's phone. Det. Littrell explained that if a message appeared on Sanchez's phone but did not appear in the screenshots from Jane's phone it could mean that Sanchez either typed the message and never sent it or that Jane deleted it once she received it.

4

Jane's physical exam at the CAC was performed by a physician aided by Judy Withers (Nurse Withers), a sexual assault nurse examiner. Jane's physical exam revealed she had genital warts, and the findings were "consistent with sexual abuse," although Nurse Withers explained during cross-examination that any time a child reports sexual abuse, the CAC's medical staff will make a finding that the exam is consistent with sexual abuse.

At trial, the Commonwealth presented both the original screenshots taken from Jane's phone and a translation of those texts by a Spanish-English translator that was stipulated to by the parties. The translated text messages spanned fifty-one pages, and Jane read from them extensively. For our purposes, we limit the recitation of those texts to the dates corresponding to the counts ultimately submitted to the jury. For each of the nine charges, the jury was instructed on first-degree rape, third-degree rape, and two theories of first-degree sexual abuse, one based on forcible compulsion and one based on Jane's and Sanchez's respective ages.

For Count 1, occurring on or about June 20, 2016, Jane identified June 20 at the CAC based on the following text exchange:

> At 2:25 pm:
> **Sanchez:** [Jane] what are you doing?
> **Jane:** Nothing, why?

> At 9:53 pm:
> **Sanchez:** [Jane] yes or no? Later on and if not I won't pay for your cell phone minutes.[4]

---

[4] We use punctuation rather than spacing to indicate that a text was sent separately.

Jane testified that Sanchez would often use the phrase "yes or no" when he wanted her to have sex with him, and that in this exchange he was threatening to stop putting minutes on her phone if she refused him.

Regarding Count 2, occurring on or about June 28, 2016, the following exchange occurred at 11:19 pm:

**Sanchez:** When do you get your period [Jane]?
**Jane:** I don't know.
**Sanchez:** But it's been over a month, right?
**Jane:** Yes.
**Sanchez:** But you're usually late, aren't you?
**Jane:** No.
**Sanchez:** What do you mean no?  You've gone up to two months without getting it, haven't you?
**Jane:** No.
**Sanchez:** You look fat to me.
**Jane:** Why?
**Sanchez:** I don't know and what if you are?  What are you going to do?
**Jane:** I don't know.  This is your fault.
**Sanchez:** But seriously, you don't know when you got it?
**Jane:** Yes.
**Sanchez:** When?
**Jane:** 25.
**Sanchez:** 25th of which month?
**Jane:** Last month.
**Sanchez:** So you already got it?
**Jane:** Not this month.
**Sanchez:** You just need to get it for this month.
**Jane:** Right.
**Sanchez:** Ok because I'm scared.
**Jane:** It's your fault.
**Sanchez:** It's cause your ass is so tasty.

Jane identified this date at the CAC based on the text that translated to "it's cause your ass is so tasty."  She explained that he had raped her sometime before the exchange and feared he had gotten her pregnant.

Regarding Count 3, occurring on or about June 29, 2016, the following text messages were exchanged at 5:33 pm:

6

> **Sanchez:** Are you going?
> **Jane:** Where?
> **Sanchez:** To Somerset.
> **Jane:** I don't know, you?
> **Sanchez:** There and then later in the woods.  You're gonna make me cum first and then I'll give it to you.
> **Jane:** Give me what?

Jane explained that the translation was not quite right.  She believed he was saying that they would go get Ben's milk and then they would go to "the woods."  She could not remember why he was going to Somerset that day, but she testified that taking her somewhere like Somerset and stopping on the way to rape her was a frequent occurrence.  She also identified this date while at the CAC using the text that said they would go to "the woods," which referred to a wooded area near the park in Monticello.

For Count 4, occurring on or about July 5, 2016, Jane accidentally wrote down "July 5" at the CAC, but the text was actually sent on July 2, at 1:23 pm. It read:

> **Sanchez:** If you send me another one I'll give you your money so you can go to the fair again.  Let's go fuck later on.  As soon as I get there.  Put your elastic waisted shorts on to make it easy to pull down.  Take a shower because you're just going to go and pick up your mom.  We'll go fuck first and then after that on your way back you can go by and pick your mom up from the park.

Jane identified this occurrence at the CAC based on Sanchez's reference to a pair of shorts with an elastic waistband he would often tell her to wear because they were easy to pull down.  She further identified this as an instance of him not letting her do something unless she agreed to have sex with him.

For Count 5, occurring on or about July 22, 2016, the following texts were exchanged:

7

At 7:09 am:

> **Sanchez:** Give it to me.  She is sick you already know
> to hurry up.  Hurry up.  Hurry up [Jane].  Hurry
> up [Jane].

At 9:59 am:

> **Sanchez:** [Jane] will you give it to me later on?  We
> can go pick up some McDonald's.  Yes or no?

Jane testified, and other text messages reflect, that Sanchez would often tell Jane that her mother was too sick to have sex with him so Jane needed to instead.  Jane wrote down July 22 at the CAC as a date she believed a rape had occurred.

For Count 6, occurring on or about August 4, 2016, Jane again accidentally wrote down the wrong date.  At the CAC, she identified a text as having occurred on "August 4" that referred to them going to "the woods."  The full exchange, which took place on August 9 at 12:08 pm was as follows:

> **Sanchez:** Will you give me just a little bit later on or not?  I'll come
> by and pick you up a bit later.
> **Jane:** For what?
> **Sanchez:** For the woods.
> **Jane:** Why?
> **Sanchez:** Like you don't know. . . our secret hideout.  Yes or no?
> If your mom goes to the store you stay here.  Stay.  [Jane]
> please stay.  And your mom.  Give it to me.  Yes or no?  You
> call her and ask where she is because she is going to suspect
> something.
> **Jane:** No.
> **Sanchez:** Come here to the other bathroom.  I promise I will go
> and pick you up later.  What time is practice over?

Jane explained that Sanchez would often have her come to a bathroom on the far end of the family home to assault her.

For Count 7, occurring on or about September 17, 2016, the Commonwealth entered a video into evidence that Jane alleged captured

8

Sanchez coming into her bedroom and raping her. As previously noted, in addition to saving text messages Jane took some pictures and videos of Sanchez to potentially use against him. The exhibit itself was bodycam footage of Jane's phone recorded by the lead investigator, Detective Derek Lester (Det. Lester). In other words, it is a recording of a recording. For the video captured on September 17, Jane explained that she and Ben were sleeping in her bed and Adam was sleeping in his bed in the same room when Sanchez unlocked the bedroom door and came in. In the video, nothing can be seen, but a baby can be heard cooing and then Jane says "why?" and tells Sanchez to stop twice. Heavy breathing is then heard, which Jane attested was Sanchez raping her. In addition, the following text messages were exchanged on September 17:

> At 8:40 pm:
>
> **Sanchez:** [Jane] be nice and give it to me again. Is [Adam] there with you? I'll be there soon. Yes or no?
>
> At 11:35 pm:
>
> **Sanchez:** How do you order your clothes?
> **Jane:** Which clothes?
> **Sanchez:** The ones you order from California or wherever you order it from.
> **Jane:** I don't know what you're talking about because I don't have any clothes like that.
> **Sanchez:** Don't you order it with that guy or whatever?
> **Jane:** But those aren't mine, they're his.
> **Sanchez:** I'm saying if you know how to order them you can order some. I'll pay for it.

The Commonwealth argued during closing arguments that Sanchez had raped Jane that day prior to sending the 11:35 pm messages, in which he was trying to bribe her to stay quiet by offering to buy her clothes.

Next, for Count 8, occurring on or about November 16, 2016, the Commonwealth introduced a second video, again recorded on bodycam by Det. Lester on the same date he recorded the video from September 17. Like the first video, nothing can be seen, but Jane can be heard saying "stop" and heavy breathing is again heard. Jane testified that Sanchez had come into her room in the middle of the night and raped her. She further identified November 16 as one of two dates she specifically recalled a rape occurring.

Finally, for Count 9, occurring on or about November 26, 2016, Jane stated she remembered this date because it was the last time Sanchez raped her, as she reported him three days later. She explained that her mom had left to go to the store when the following exchange occurred at 1:58 pm:

> **Sanchez:** Where did your mom go?
> **Jane:** The store. Why?
> **Sanchez:** Come here. Hurry up. Give it to me quickly. Hurry up. Well hurry up then.

Jane testified he vaginally penetrated her on that date.

Sanchez testified in his own defense that he had never sexually abused Jane and had never sent her any text messages, even "normal" ones. He further stated that because he has diabetes, he is unable to have sex due to a lack of energy, and that he never took Jane anywhere in a car alone. The defense also demonstrated through a non-expert witness that there is a cellphone application called "Jalli" that allows someone to "plant" text messages on someone else's phone so that it looks as though a text was sent from that phone when it was not. However, the witness acknowledged on cross-examination that the application did not come out until 2018, two years

10

after the text exchanges at issue here.  Finally, the defense highlighted that a forensic search of Jane's phone was never performed.  Det. Lester explained that he did not want to take Jane's phone because she needed it to see to the family's needs such as her mother's and Ben's doctor's appointments.

Based on the foregoing evidence, the jury found Sanchez guilty of five counts of first-degree rape for Counts 3, 5, 7, 8, and 9, and found him guilty of four counts of third-degree rape for Counts 1, 2, 4, and 6.  The jury recommended a 10-year sentence for each of the first-degree rape convictions, and a five year sentence for each of the third-degree rape convictions to run consecutively for a total sentence of seventy years.  He now appeals.

Additional facts are discussed below as necessary.

## II.    ANALYSIS

### A. The trial court erred by allowing Nurse Withers to repeat Jane's statement that "my dad made me have sex with him," but the error was harmless.

Nurse Withers testified that she examined Jane at the CAC in 2016, but she did not remember seeing her specifically and would have to refer to the medical exam report to provide any details regarding her exam.  After being given a copy of Jane's report, she explained that it was her practice to write whatever a child told her in the in the "reason for exam" section of the report.  The Commonwealth confirmed that her reason for doing this was "for medical purposes only," and then asked her to read the "reason for exam" section of Jane's report.  Defense counsel objected and argued during a side bench that Nurse Withers should be limited to simply saying that Jane was referred to the CAC regarding potential sexual abuse and that using Jane's exact words

11

constituted impermissible hearsay and improper bolstering. The Commonwealth responded that Jane's statement could come in under the "medical records exception" because the evidence went strictly to why the exam was being performed. The trial court overruled the defense's objection without further discussion. Nurse Withers then read the "reason for exam" section of the report verbatim, which stated: "[Patient] states 'my dad made me have sex with him.' States last time was 11/26/16."[5] The unredacted report was later submitted to the jury. None of the other witnesses repeated Jane's identification of Sanchez as her abuser, and Nurse Withers did not repeat any details of the abuse.

Sanchez argues before this Court that the trial court's admission of the identification testimony constituted reversible error under our precedents of *Colvard v. Commonwealth*,[6] *Alford v. Commonwealth*,[7] and *Hoff v. Commonwealth*.[8] The Commonwealth responds that this case is more comparable to *Justice v. Commonwealth*,[9] and that any error was harmless. For the reasons that follow, we agree with the Commonwealth.

---

[5] We accordingly disagree with the Commonwealth's assertion that defense counsel's objection was not specific enough to preserve this issue, as it was very apparent from context what counsel was objecting to. *See* Kentucky Rule of Evidence (KRE) 103(a)(1).

[6] 309 S.W.3d 239 (Ky. 2010).

[7] 338 S.W.3d 240 (Ky. 2011).

[8] 394 S.W.3d 368 (Ky. 2011).

[9] 636 S.W.3d 407 (Ky. 2021) *abrogated on other grounds by Sexton v. Commonwealth*, 647 S.W.3d 227 (Ky. 2022).

This Court reviews a trial court's ruling on the admission of evidence for an abuse of discretion.[10]  Under this standard, we determine whether the trial court's ruling was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[11]  Nevertheless, even if we conclude that a trial court abused its discretion, RCr[12] 9.24 directs that we "must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties."  Stated differently,

> [a] non-constitutional evidentiary error may be deemed harmless if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error.  The inquiry is not simply whether there was enough evidence to support the result, apart from the phase affected by the error.  It is rather, even so, whether the error itself had substantial influence.  If so, or if one is left in grave doubt, the conviction cannot stand.[13]

With this directive in mind, we now discuss the respective cases relied upon by the parties.

In *Colvard,* Fred Colvard was convicted, in relevant part, of one count of first-degree sodomy and two counts of first-degree rape committed against two victims, D.J. (six years old) and D.Y. (seven years old).[14]  Colvard, who had previously lived in the children's apartment building and had been engaged to their grandmother for a time, assaulted the girls in their bedroom.[15]  When the girls reported the abuse to their mother, she immediately reported it to law

---

[10] *See, e.g., Meece v. Commonwealth,* 348 S.W.3d 627, 645 (Ky. 2011).

[11] *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999).

[12] Kentucky Rule of Criminal Procedure.

[13] *Colvard,* 309 S.W.3d at 249 (internal citations and quotation marks omitted).

[14] *Id.* at 242.

[15] *Id.*

enforcement.[16] At trial, over Colvard's objection, three medical professionals and three lay witnesses were permitted to repeat the children's identification of Colvard as their abuser as well as other inflammatory facts relayed to them by the children.[17]

The three medical professionals' testimony was as follows. The EMT who responded to the emergency call testified that one of the children said that "Fred . . . stuck his 'dick' in her," and that the other child "told her, in substance, that Colvard had 'hurt' her anus."[18] A physician from the hospital where the children were admitted for evaluation testified using notes compiled by a triage nurse that D.J. said Colvard sexually abused her and that "Fred has been f***ing her, putting his weenie in her private parts."[19] The physician further testified that both children told him that they were sexually assaulted that day "and over the past months."[20] Finally, a physician that performed follow up examinations and treatment testified that she saw the children because of sexual abuse allegations made against "a neighbor" named "Fred," and that one of the children told their mother that "Fred was f***ing us."[21]

The lay witness testimony included the children's uncle, who testified that D.Y. pointed to Colvard when he asked her "what happened, who touched

---

[16] *Id.*

[17] *Id.* at 242-49.

[18] *Id.* at 243.

[19] *Id.*

[20] *Id.*

[21] *Id.*

her."[22] The victims' mother also testified that D.Y. stated Colvard "took his weenie out of his zipper and put it in her, but not all the way."[23] Finally, a forensic interviewer repeated D.J.'s statement that Fred had put his penis in her and had circled the genital area when asked to show where a penis was on a drawing of a male.[24]

The trial court admitted the medical personnel's identification testimony under a then-existing exception to the general rule "that the identity of the perpetrator is not relevant to treatment or diagnosis. . . [except] in cases where a family or household member is the perpetrator of sexual abuse against the minor of that household."[25] On appeal, the *Colvard* Court abandoned that exception based on its conclusion that it did not serve the purpose of KRE 803(4), the medical treatment exception, i.e., that "[t]here is no inherent trustworthiness to be found in a hearsay statement identifying the perpetrator when that statement did not arise from the patient's desire for effective treatment."[26] It further held that the lay witnesses' testimony was likewise not subject to any hearsay exceptions.[27]

The Court held that the medical personnel testimony "in combination with the other inadmissible hearsay statements let into trial" resulted in

---

[22] *Id.* at 247.

[23] *Id.* at 248.

[24] *Id.* at 249.

[25] *Id.* at 244.

[26] *Id.* at 246. The Court clarified that it was not holding that such statements are *always* inadmissible, and that there could be a situation where a child victim's identification of an abuser did meet the requirements of KRE 803(4). *Id.* at 247.

[27] *Id.*

15

reversible error.[28]  The Court reasoned that because both the medical and lay testimony served to bolster the children's testimony and the Commonwealth's theory of the case and was highly prejudicial.[29]  The Court concluded that this "parade of witnesses vouching for the Commonwealth's theory of the case," in conjunction with "the lack of DNA or other physical evidence linking [Colvard] to the crimes," rendered it unable to say with fair assurance that the judgment was not substantially swayed by the improper identification testimony.[30]  It accordingly reversed and remanded for a new trial.[31]

In *Alford*, William Alford was convicted of first-degree sodomy and first-degree sexual abuse committed against S.A., his live-in girlfriend's daughter.[32] S.A. reported the abuse at age thirteen to her stepsister and stepmother during a visit with her biological father, though she alleged the abuse had been happening for several years.[33]  At trial, S.A. testified extensively regarding the abuse, and her allegations were "the only evidence linking [Alford] to the evidence of sexual contact."[34]

Detective Bruce Slack, who interviewed S.A. on the same date she reported the abuse, testified at length about S.A.'s statements during that interview, including: that her statement was consistent with her testimony at

---

[28] *Id.*

[29] *Id.* at 247, 249.

[30] *Id.* at 250.

[31] *Id.*

[32] *Alford*, 338 S.W.3d at 243.

[33] *Id.*

[34] *Id.*

trial; that she stated Alford never used condoms; that Alford told her mother he would kill her if she ever left him; that he tricked her into drinking gin and orange juice; that he told her she was "really good at it"; that she estimated he had raped her 300-400 times; that he made her perform oral sex four days per week; and that he hit, choked, and kicked both her and her little brother.[35] The Court noted that there was "no hearsay exception for statements made by an alleged victim of sexual abuse to a police detective[,]" and that it had "consistently recognized that this type of hearsay testimony is highly prejudicial."[36]

In addition, Dr. Patrick Hayden, who interviewed and examined S.A. two months after she first reported Alford, read extensively from his interview with S.A.[37] In doing so, he identified Alford as the perpetrator and essentially repeated the allegations to which S.A. had already testified.[38] He stated that S.A. told him that she had been repeatedly raped over a number of years by her mother's boyfriend; he testified at length as to various acts of oral, anal and vaginal intercourse, and sexual touching that S.A. relayed to him; and he stated that S.A. told him Alford would beat, kick, hit, and slap her, and that she saw him hit and punch her mother and stepsister.[39]

---

[35] *Id.* at 245-46.

[36] *Id.* at 246.

[37] *Id.* at 247.

[38] *Id.*

[39] *Id.*

The *Alford* Court, reviewing for palpable error, characterized the foregoing as "an egregious amount of inadmissible hearsay,"[40] and held that "the cumulative, if not individual, error in the admission of the extensive and highly prejudicial hearsay by Dr. Hayden and Detective Slack unfairly bolstered the credibility of S.A. to the extent as to rise to palpable error."[41] It reversed and remanded for a new trial.[42]

In *Hoff*, the final case Sanchez cites, David Hoff was convicted of eight counts of first-degree rape and eight counts of incest perpetrated against his then-twelve-year-old biological daughter, B.H.[43] B.H. alleged that Hoff had been repeatedly raping her since she was four years old.[44] The Commonwealth's case against Hoff relied almost solely on B.H.'s credibility, "as there was limited physical evidence of the crimes."[45]

Dr. Travis Calhoun performed B.H.'s physical examination sometime during the month she disclosed.[46] Dr. Calhoun testified at trial and his forensic examination report was entered into evidence.[47] Dr. Calhoun stated, *inter alia*, that B.H. told him the only person she ever had sex with was her father.[48] That information was included in his report, as well as the following:

---

[40] *Id.* at 245.

[41] *Id.* at 248.

[42] *Id.*

[43] *Hoff*, 394 S.W.3d at 370.

[44] *Id.*

[45] *Id.* at 371.

[46] *Id.*

[47] *Id.*

[48] *Id.* at 372.

that Hoff had recently taken her to Louisville to meet a man he met online and made her undress and go into a bedroom with the man who then "rubbed her private parts," and that she had recently told her teacher and wrote in her diary that her father had raped her.[49]  Dr. Calhoun further testified that he had no reason not to believe what B.H. reported to him during the examination, and his report stated that he believed "the child has in fact been sexually abused."[50]  The unredacted report was submitted to the jury.[51]

The *Hoff* Court held that the physician repeating the child's identification of Hoff as the perpetrator was improper under *Colvard* and *Alford,* and that the statements about Hoff taking her to be abused by another man in Louisville and her statements that she both wrote in her diary and informed her teacher that Hoff was raping her were likewise improper hearsay.[52]  Reviewing for palpable error, the Court held that "the extensive use of inadmissible hearsay and the impermissible bolstering of B.H.'s testimony was highly prejudicial to [Hoff]" and rose to the level of manifest injustice, requiring reversal for a new trial.[53]

In the case relied upon by the Commonwealth, *Justice*, Charles Justice was convicted of four counts of first-degree sexual abuse, incest, attempted first-degree rape, attempted promotion of a sexual performance by a minor,

---

[49] *Id.*

[50] *Id.* at 375.

[51] *Id.* at 372.

[52] *Id.* at 374.

[53] *Id.* at 379.

19

distribution of matter portraying a sexual performance by a minor, and promotion of a sexual performance by a minor.[54] Two of Justice's victims were his biological daughters C.J. and E.W.[55]

In addition to the children's respective testimonies, the Commonwealth presented evidence that an image that was flagged by the National Center for Missing and Exploited Children had been traced back to the IP address of Justice's residence.[56] The image depicted a very young child's vagina being spread open by two adult fingers.[57] The children's mother identified the hand as Justice's hand and identified the bedsheets that appeared in the image.[58] C.J. testified Justice took photographs of her, and the website where the image had been uploaded was bookmarked in Justice's phone.[59] In addition, C.J. and E.W. both testified the sexual abuse included the use of sex toys, and DNA samples taken from several sex toys found within Justice's home matched both Justice and E.W.[60]

Dr. Anderson performed E.W.'s medical examination and, at trial, "[i]n a single statement, as she was reading her office notes," she stated that E.W. identified her father as her abuser.[61] Another physician, Dr. Segal, read from

---

[54] 636 S.W.3d at 410.

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] *Id.* at 410-11.

[60] *Id.* at 410.

[61] *Id.* at 414.

20

his medical report "that identified Justice as C.J.'s abuser and that C.J. had said Justice had tried to touch her vagina, play with sex toys, and cause oral-penile contact."[62]  At Justice's request, both of the medical reports were submitted to the jury in a redacted form that deleted the identification of Justice as the abuser.[63]

The *Justice* Court held that the admission of the physicians' respective testimonies was error under *Colvard*.[64]  However, it went on to hold that the error, although it may have resulted in some prejudice, it was not so egregious an error that it shocked the conscience and reversal was not required, i.e., the error was not palpable.[65]

Accordingly, in this case, we hold that the trial court abused its discretion by allowing Nurse Withers to repeat Jane's identification of Sanchez as her abuser and by allowing the unredacted CAC medical report to be entered into evidence.  Under *Colvard* and its progeny, a child sex abuse victim's identification of his or her abuser is not generally admissible under KRE 803(4), "[s]tatements for purposes of medical treatment or diagnosis."[66]

---

[62] *Id.*

[63] *Id.*

[64] *Id.* at 415.

[65] *Id.*

[66] KRE 803(4) provides that "[t]he following are not excluded by the hearsay rules, even though the declarant is available as a witness . . . [s]tatements made for purposes of medical treatment or diagnosis and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment or diagnosis."

But that does not end the inquiry; we must next determine whether the error was harmless. Here, a single witness repeated Jane's statement that Sanchez made her have sex with him, and that the last time the abuse occurred was on November 26, 2016. Details of the abuse were not recounted by Nurse Withers, and no other witnesses repeated Jane's identification of Sanchez. These facts are drastically dissimilar to *Colvard*, *Alford*, and *Hoff*. In *Colvard*, six witnesses, both medical and lay, were permitted to repeat various statements of identification, and were additionally permitted to repeat highly inflammatory details of the abuse. In *Alford*, a member of law enforcement and a medical expert similarly testified both to the child's identification of her abuser and to details of the abuse. In *Hoff*, a single medical expert testified to the child's identification of her abuser, to details of the abuse, and to an uncharged bad act that the defendant had taken the child to be sexually abused by another individual. Here, only one witness repeated Jane's identification of Sanchez and did not testify to any prejudicial details of the abuse and an unredacted copy of her report was entered into evidence. Accordingly, the complained-of testimony here is more akin to *Justice*. In that case, the report was redacted to omit the identification before being submitted to the jury, but two separate witnesses testified to the identification, and one provided additional details.

Significantly, this Court also noted in *Colvard*, *Alford*, and *Hoff*, that the only evidence directly linking the respective defendants to the alleged crimes was the testimony of the victims, rendering any bolstering of the victims' testimonies highly prejudicial. Compare this with *Justice*, wherein Justice was

22

linked to the charges against him by both a photograph of a child being sexually exploited and by his DNA and one of the children's DNA being found on sex toys confiscated from the home where the abuse occurred. In this case, as in *Justice*, the Commonwealth presented independent evidence of Sanchez's guilt in addition to Jane's testimony. The litany of sexually explicit text messages sent to Jane by Sanchez were highly probative of the fact that he raped her repeatedly and frequently, as were the videos she recorded.

The foregoing evidence, coupled with the fact that Nurse Withers simply repeated Jane's statement that Sanchez made her have sex with him without any additional details of the abuse renders this Court unable to say it is in "grave doubt" as to whether Nurse Withers' testimony had a substantial influence on the outcome of the case. We therefore hold that, while error occurred, it was harmless, and we affirm.

## B. The text messages and videos were properly authenticated.

Sanchez next asserts that neither the screenshots of the text messages nor the two videos that purportedly captured Sanchez raping Jane were properly authenticated under KRE 901 in accordance with *Brafman v. Commonwealth*.[67] Defense counsel objected to the admission of both the screenshots and the videos at trial based on a lack of proper authentication.[68] We accordingly review the trial court's admission of the evidence for abuse of

---

[67] 612 S.W.3d 850 (Ky. 2020).

[68] To be clear, while defense counsel stipulated to the translation of the text messages, it objected to their admission.

discretion,[69] and must uphold the trial court's decision to admit the evidence unless doing so was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[70]

KRE 901 provides:

(a) General provision.  The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

(b) Illustrations.  By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

(1) Testimony of witness with knowledge.  Testimony that a matter is what it is claimed to be.

. . . .

(4) Distinctive characteristics and the like. Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.

"The Commonwealth's burden under KRE 901 to authenticate a writing is slight, requiring only a *prima facie* showing."[71]

It must be shown that the material is a true and accurate reflection of what it is purported to be.  Whether there is enough evidence of authenticity to admit evidence is within the discretion of the trial court.  Typically, the foundational authenticity of a writing can be laid simply by the testimony of someone personally familiar with the writing or by the contents and characteristics of the writing itself.[72]

---

[69] *Meece*, 348 S.W.3d at 645.

[70] *English*, 993 S.W.2d at 945.

[71] *Kays v. Commonwealth*, 505 S.W.3d 260, 270 (Ky. App. 2016) (citing *Ordway v. Commonwealth*, 352 S.W.3d 584, 593 (Ky. 2011); *Sanders v. Commonwealth*, 301 S.W.3d 497, 501 (Ky. 2010)) (internal quotation marks omitted).

[72] *Brafman*, 612 S.W.3d at 866.

24

In *Brafman,* Karen Brafman was tried for first-degree and second-degree arson and six counts of attempted murder after she set her neighbors' trailer on fire while it was occupied by Craig Calloway, Ashley Webster, and four of their six children.[73]  Calloway and Webster were an interracial couple; three of their children were biracial and the other three children were Webster's, an African American, from a previous relationship.[74]  Following Brafman's conviction, four of the attempted murder charges were enhanced to hate crimes against each of the children present in the home on the night of the fire.[75]

To support the hate crime enhancement, the Commonwealth presented evidence that at some point in the past Brafman had called the children "oreos" and had uttered racial slurs from her porch.[76]  As is relevant here, the Commonwealth also produced what appeared to be "a screenshot of a short series of text messages" sent to David Sova, Brafman's ex-boyfriend and former co-habitant that had introduced Brafman to Calloway and Webster.[77]  The messages read:

> Why you're up cooking f****** dope
> F****** whores
> I'm goin to kill the N***** and u
> I should of a long time ago
> David that is for u too
> Watch what happens David [cutoff].[78]

---

[73] *Id.* at 855-56.

[74] *Id.* at 856.

[75] *Id.* at 857.

[76] *Id.* at 863.

[77] *Id.* at 856.

[78] *Id.* at 866.

The *Brafman* Court provided a number of reasons why the Commonwealth had failed to properly authenticate the screenshot. In the first place, the messages were introduced through Sova at trial, who "merely stated that Brafman sent these messages to him."[79] "[N]othing about the screenshot [linked] the messages to Brafman personally, such as a name at the top of the interface," although the Court noted that a contact name alone has little probative value because it can be easily manipulated.[80] And, significantly, "[t]he Commonwealth laid no foundation as to Brafman's ownership of the phone number."[81] There was also

> no timestamp by which any time or date [could] even superficially associated with [the] messages, individually or as a series, making it unclear whether the statements [were] relevant to the case at hand. Nothing contextualized the messages linking them to Brafman's charges, and there [was] no other evidence that [revealed] to whom, other than perhaps "David" himself, the messages purportedly refer.[82]

This Court held that the trial court had abused its discretion by admitting the screenshot "because the Commonwealth presented nothing to authenticate the messages as being typed and sent by Brafman and presented insufficient evidence of context."[83] It concluded by stating that "[w]hile the threshold for authenticating writings is generally low, the susceptibility of cellular messages and screenshots to quick fabrication and alteration requires

---

[79] *Id.*

[80] *Id.* at 867 n.63.

[81] *Id.* at 867.

[82] *Id.*

[83] *Id.*

26

a more discerning eye from the trial court and more than mere assertions by a lay witness that they were sent by the criminal defendant."[84]

In contrast to *Brafman*, Jane testified that when she began thinking about reporting Sanchez's abuse, she kept the text messages he sent her. She explained that after she reported Sanchez, Det. Lester had her come to the police station, screenshot the text messages, and print them directly to the station's printer. Det. Lester testified he was present at the police station when Jane printed the messages and watched her unlock her phone, screenshot, and print them. When Jane was shown the exhibit of the screenshots, she identified them as the messages Sanchez sent her and the ones she printed at the police station. The exhibit itself appears to be screenshots taken on an iPhone from the contact "Dad." The messages have corresponding dates and times, frequently refer to Jane by name, and are clearly related to the sex crimes for which Sanchez was charged. Moreover, Jane testified that Sanchez's phone number was (606-***-****) and that her phone number was (606-***-****)[85]. Both phone numbers were also written on the sheet of paper Jane used to pinpoint dates of the abuse while at the CAC. Both phone numbers were later confirmed by the detective that performed a forensic search of Sanchez's phone, and several messages extracted from Sanchez's phone matched messages found within the screenshots.

---

[84] *Id*. at 867-68.

[85] As it is unknown whether the victim continues to use this cellphone number, we have omitted it.

Obviously, the screenshots here do not suffer from the overt lack of authentication that was present in *Brafman*. The trial court was presented with more than enough evidence to conclude, through a discerning eye, that the screenshots were what they were purported to be. We consequently hold that the screenshots were properly authenticated, and the trial court did not abuse its discretion.

Next, regarding the videos, Jane testified that she recorded the videos on her phone. The exhibit itself is footage from Det. Lester's bodycam while he and Jane are sitting in his cruiser. In the bodycam footage, Det. Lester takes the phone from Jane and plays the videos. He then notes the dates the videos were recorded based on the dates at the top of their respective interfaces. Det. Lester testified the video was an accurate reflection of what he recorded on his bodycam. Sanchez argues to this Court that the videos were not properly authenticated because no forensic search was done of Jane's phone, and he was not given the opportunity to examine Jane's phone. We disagree. KRE 901(a) provides that to authenticate a piece of evidence as a condition precedent to admissibility "is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." Det. Lester's testimony that the recording accurately reflected the footage he captured using his bodycam was sufficient to meet this low bar for admissibility. The trial court did not abuse its discretion by admitting them.

**C. Sanchez was not entitled to a missing evidence instruction.**

Sanchez next alleges he was entitled to a missing evidence jury instruction for his cellphone.

28

Det. Littrell, the digital forensics expert that performed the forensic search of Sanchez's phone, testified that different kinds of data extractions can be performed on a cellphone depending on its manufacturer and model. Det. Littrell first attempted to perform a "physical extraction" on Sanchez's phone, a Samsung Galaxy S5. A physical extraction makes an exact copy of the memory chip, including things that have been deleted, and can be performed by simply plugging the phone into an "examination machine" via its USB port. Det. Littrell attempted to plug Sanchez's phone into several different examination machines, all with different USB cords, and continued to get an error message concerning the cellphone's USB port. He concluded this meant that the USB port was not functioning properly and therefore a physical extraction would not be possible.

Instead, Det. Littrell opted to perform a "chip-off extraction." A chip-off extraction involves removing a phone's internal memory chip and placing it in a "special reader." Because the memory chip is soldered in place inside the cellphone, a chip-off extraction requires that the cellphone itself be destroyed. Det. Littrell explained that none of the data extracted from the cellphone is affected, but the cellphone itself is rendered "useless." Det. Littrell further testified that any party to a criminal case can access the data file from a data extraction unless it contains child exploitation material.

While discussing jury instructions, the defense requested a missing evidence instruction for Sanchez's cellphone. It argued that it had filed a pre-trial notice not to destroy evidence, and that it had not been given notice that the phone would be destroyed. The Commonwealth responded that the defense

had presented no evidence of bad faith by law enforcement and that the phone itself contained no evidence after the chip-off extraction was performed. The trial court declined to provide the jury with a missing evidence instruction. We will accordingly review this issue for abuse of discretion[86] and will reverse only if the trial court's omission of a missing evidence instruction was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[87]

> A missing-evidence instruction is one way to cure an alleged violation of due process per *Brady v. Maryland*, [373 U.S. 83 (1963)] other than dismissal of the charge altogether or exclusion of the Commonwealth's evidence outright, the latter two being the more drastic remedies. Entitlement to the instruction arises when purportedly exculpatory evidence was destroyed by the Commonwealth intentionally or inadvertently "outside of normal practices," or when such evidence was so significant and forever lost that it compromises the defendant's due-process right to a fair trial.[88]

Before this Court, Sanchez does not allege any bad faith by the Commonwealth, or that his phone would have contained exculpatory evidence. Indeed, it was undisputed that a chip-off extraction destroys the phone itself while preserving the data extracted from it. Instead, he urges this Court to abandon the bad faith requirement for a missing evidence instruction in criminal cases and adopt the standard applied in civil cases. To prove entitlement to a missing evidence instruction in civil litigation, a litigant "only [has] to show that the opposing party had exclusive control over the evidence

---

[86] *See, e.g., Sutton v. Commonwealth*, 627 S.W.3d 836, 848 (Ky. 2021).

[87] *English*, 993 S.W.2d at 945.

[88] *Dooley v. Commonwealth*, 626 S.W.3d 487, 502 (Ky. 2021).

when it went missing and that the evidence is missing without explanation."[89] Sanchez points to this Court's dicta in *Dooley v. Commonwealth* that "our historical imposition of a higher burden on criminal defendants than civil litigants is more than curious[,]" and urges us to join several of our sister states in lowering that burden. However, while we stand by our statement in *Dooley* that we may soon have to address those disparate standards,[90] this is simply not the case in which to do it. After the chip-off extraction was performed, Sanchez's cellphone contained no evidence whatsoever, exculpatory or otherwise, and the trial court did not abuse its discretion by denying Sanchez's request for a missing evidence instruction.

## D. Sanchez waived his argument that each of the first-degree rape instructions contained a unanimous verdict violation.

Sanchez next contends that each of the nine first-degree rape instructions contained a unanimous verdict violation. Sanchez acknowledges this alleged error is unpreserved, and requests review for palpable error under RCr 10.26. The Commonwealth contends that Sanchez waived this argument by agreeing to the jury instructions that were ultimately submitted to the jury, and we agree.

To begin, we note that although the video record indicates that Sanchez tendered his own proposed jury instructions to the trial court, those proposed instructions were not included in the record now before us. The absence of Sanchez's tendered jury instructions leaves this Court unable to say whether

---

[89] *Id.* at 502.

[90] *Id.* at 503.

his tendered instructions contained the same alleged errors he now argues require reversal.[91]  In addition, during the parties' discussion of the jury instructions with the trial court they agreed to separate each of the first-degree sexual abuse counts into two separate instructions—one based on forcible compulsion and one based on Sanchez's and Jane's respective ages—to avoid a unanimous verdict violation.  The defense then stated that its only other objection to the jury instructions was a lack of a missing evidence instruction as discussed *supra.*  After the motion to include a missing evidence instruction was denied, the following exchange occurred:

> **Defense:** Are we finished then?
> **Court:** I think we've agreed.  The only thing you didn't agree on
>       was preservation of the evidence.
> **Defense:** Missing evidence, yes.
> **Court:** So, we just need to review it after it's printed.
> **Defense:** Right.

By expressly agreeing to the jury instructions, apart from the absence of a missing evidence instruction, Sanchez waived his ability to now challenge those instructions on appeal.[92]

At any rate, even if this Court were to review for palpable error as Sanchez has requested, the challenged instructions do not contain a palpable unanimous verdict violation.  Section 7 of the Kentucky Constitution requires a unanimous jury verdict.[93]  As is relevant here, "a general jury verdict based on

---

[91] *See, e.g.*, *Webster v. Commonwealth*, 438 S.W.3d 321, 324 (Ky. 2014).

[92] *Quisenberry v. Commonwealth*, 336 S.W.3d 19, 38 (Ky. 2011) ("[I]nvited errors that amount to a waiver, i.e., invitations that reflect the party's knowing relinquishment of a right, are not subject to appellate review.").

[93] *See, e.g.*, *Ruiz v. Commonwealth*, 471 S.W.3d 675, 678 (Ky. 2015).

an instruction including two or more separate instances of a criminal offense, whether explicitly stated in the instruction or based on the proof—violates the requirement of a unanimous verdict."[94]

> This type of unanimous-verdict violation occurs when a jury instruction may be satisfied by multiple criminal acts by the defendant. When that is the case, and the instruction does not specify which specific act it is meant to cover, we cannot be sure that the jurors were unanimous in concluding the defendant committed a single act satisfying the instruction. Instead, the jury's verdict only reflects their unanimous view that the defendant committed the crime, without necessarily resulting in a unanimous conclusion that the defendant committed a single criminal act beyond a reasonable doubt. Therefore, in those circumstances, the jury fails to reach a unanimous verdict.[95]

Sanchez argues that the first-degree rape instructions suffered from the same unanimity problem because, although each instruction contained a specific date, Jane testified that she only believed she had been raped on those respective dates because of the content of the text messages she reviewed at the CAC. But, he argues, she also testified that the rapes would occur up to three times a week and there is accordingly no way to know which criminal act the jury found him guilty of. Sanchez further contends that the Commonwealth compounded this problem by stating during its closing argument that the precise dates did not matter because the instructions said "on or about" and that "[i]t doesn't matter if it's on or about. It could be that

---

[94] *Johnson v. Commonwealth*, 405 S.W.3d 439 (Ky. 2013), *overruled on other grounds by Johnson v. Commonwealth*, 2021-SC-0541-MR, - - - S.W.3d - - -, 2023 WL 4037845 (Ky. June 15, 2023).

[95] *Martin v. Commonwealth*, 456 S.W.3d 1, 7 (Ky. 2015), *overruled on other grounds by Johnson v. Commonwealth*, 2021-SC-0541-MR, - - - S.W.3d - - -, 2023 WL 4037845 (Ky. June 15, 2023), *abrogated on other grounds by Sexton v. Commonwealth*, 647 S.W.3d 227 (Ky. 2022).

week.  And she told you every single week he would rape her.  Every single week."

First, Sanchez's misrepresentation of the Commonwealth's closing argument should be clarified.  For each of the nine first-degree rape instructions, the Commonwealth stated the specific date that rape was alleged to have occurred.  It then walked through all the evidence that was presented in relation to a rape occurring on that date.  The quote that Sanchez refers to *supra* was specifically related to Count 6, concerning a rape occurring on or about August 9.  As noted, Jane had inadvertently identified August 4 while at the CAC, but the text she identified had been sent on August 9.  The Commonwealth explained this and then argued, "But it's August 9, she just wrote down the wrong date on here.  So, it's the same exact message.  It doesn't matter if it's on or about, it could be that week.  And she told you every single week he would rape her.  Every single week."  We further highlight that Count 6 was the only count that alleged a rape had occurred in August.

Moreover, as the Commonwealth correctly argues, "proof of the precise dates on which the offenses were committed is not required of a child sexual abuse victim where the evidence is ample to separately identify the various offenses charged."[96]  Here, for Counts 1-6, the dates of the rapes were identified based on the dates and content of the messages exchanged between Jane and Sanchez; for Count 7, the date was determined based on both a video recording and text messages exchanged on the alleged date of the offense; and

---

[96] *Miller v. Commonwealth*, 77 S.W.3d 566, 576 (Ky. 2002) (internal quotation marks omitted).

34

Jane testified she specifically remembered rapes occurring on the dates provided for in Counts 8 and 9, respectively. Moreover, one of the video recordings of Jane being raped occurred on the date provided for Count 8, and text messages were connected to the date for Count 9.

At bottom, even if this Court were to find that any of the first-degree rape instructions suffered from a unanimous verdict violation, based on the foregoing we could not hold that "the error was so manifest, fundamental, and unambiguous that it threatens the integrity of the judicial process," or that the error was "so egregious that it jumps off the page . . . and cries out for relief."[97] Sanchez would accordingly not be entitled to relief under palpable error review.

**E. The trial court's imposition of public defender fees against Sanchez was error and is hereby vacated.**

Sanchez next contends that the trial court erred by ordering him to pay a $50 public defender fee in both 17-CR-00062 and 17-CR-00020, which were later consolidated for the trial at issue herein. We agree. Kentucky Revised Statute (KRS) 31.120 provides the process by which a trial court is to determine whether a person meets the definition of "needy" for the purposes of, *inter alia*, the appointment of a public defender. The statute states in relevant part:

> (1) (a) The determination of whether a person covered by KRS 31.110 is a needy person shall be deferred no later than his or her first appearance in court or in a suit for payment or reimbursement under KRS 31.211, whichever occurs earlier.

---

[97] *Johnson*, 2021-SC-0541-MR, - - -S.W.3d - - -, 2023 WL 4037845 at *8. We note that *Johnson* became final on September 28, 2023, when the petition for rehearing in that case was denied. *See* Kentucky Rule of Appellate Procedure (RAP) 40(G)(3)(a).

(b) The court of competent jurisdiction in which the case is pending shall then determine, with respect to each step in the proceedings, whether he or she is a needy person. However, nothing shall prevent appointment of counsel at the earliest necessary proceeding at which the person is entitled to counsel, upon declaration by the person that he or she is needy under the terms of this chapter. In that event, the person involved shall be required to make reimbursement for the representation if he or she later is determined not a needy person under the terms of this chapter.

(c) A person who, after conviction, is sentenced while being represented by a public defender shall continue to be presumed a needy person, and the court, at the time of sentencing, shall enter an Order In Forma Pauperis for purposes of appeal without having to show further proof of continued indigency, **unless the court finds good cause after a hearing to determine that the defendant should not continue to be considered an indigent person**.[98]

Sanchez was represented by a public defender throughout the proceedings below as well as at the time of his sentencing and was granted *in forma pauperis* status on appeal. No hearing occurred wherein the trial court determined that Sanchez should not continue to be considered an indigent person. Absent such a hearing and determination by the trial court, the imposition of public defender fees was error and we now vacate the trial court's orders imposing a $50 public defender fee in 17-CR-00062 and 17-CR-00020, respectively.[99]

---

[98] KRS 31.120(1)(a)-(c) (emphasis added).

[99] *Accord Spicer v. Commonwealth*, 442 S.W.3d 26, 34-35 (Ky. 2014).

**F. Cumulative error did not occur.**

In the event this Court were to hold that none of the foregoing alleged errors were individually reversible, Sanchez requests that we reverse based on cumulative error. Under the cumulative error doctrine "multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair. We have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial."[100] Those circumstances are not present in this case, and we accordingly hold that cumulative error did not occur.

### III. CONCLUSION

Based on the foregoing, we affirm Sanchez's convictions and sentence and reverse and vacate the trial court's orders that he pay public defender fees.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Robert Chung-Hua Yang
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Christopher Henry
Assistant Attorney General

---

[100] *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010).