# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D),  THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE  ACTION.

RENDERED: APRIL 24, 2025
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

## 2023-SC-0397-MR

MARK HALEMAN

APPELLANT

V.

ON APPEAL FROM HENDERSON CIRCUIT COURT
HONORABLE KAREN LYNN WILSON, JUDGE
NO. 23-CR-00065

COMMONWEALTH OF KENTUCKY

APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

A Henderson County jury convicted Mark Haleman of one count of sodomy in the first degree and six counts of sexual abuse in the first degree stemming from allegations that he engaged in inappropriate sexual behavior with his great-niece, a minor child under the age of twelve. The Henderson Circuit Court thereafter sentenced Haleman to a total sentence of twenty-five years' imprisonment consistent with the jury's recommendation. Haleman now appeals to this Court as a matter of right and challenges his convictions. *See* KY. CONST. § 110(2)(b). Because we are unpersuaded by Haleman's arguments, we affirm the Henderson Circuit Court.

# I. FACTS & BACKGROUND

In 2015, Christina Haleman ("Christina") and her minor daughter K.M.[1] lived in a three-bedroom trailer in Henderson County with Christina's father Frank Haleman ("Frank") and her uncle Mark Haleman ("Haleman"). While Christina continued to live with her father and uncle over the years, she had three more daughters. According to Christina, Frank and Haleman would each routinely watch her children while she was not home. Christina worked at night.

According to Christina's eldest daughter, K.M., Haleman began to sexually abuse her when she was in the first grade, and continued to abuse her until she was in the fifth grade. K.M. was born in 2009 and was fourteen years old at the time of Haleman's 2023 trial. K.M. testified that on the first instance Haleman sexually abused her, she came home from school and Haleman "pulled me on the bed and started touching me inappropriately on my breasts and my butt." K.M. specified that Haleman touched her body with his hands, both under and over her clothes. According to K.M., Haleman similarly touched her "a few times" on other occasions when she was in the first grade. K.M. also testified that Haleman touched her breasts and her butt on at least one occasion when she was in the third grade. She specified that, "He'd come in whatever room I was in, and he'd put his hands under my shirt or in my pants and touch my chest or my butt."

---

[1] We use this child's initials to protect her identity and privacy.

K.M. could not recall if Haleman had inappropriately touched her while she was in the second or fourth grades. K.M. did, however, testify to more serious instances of abuse during her childhood when Haleman placed his penis in her mouth, touched her vagina with his hand, and forced her to rub his penis with her feet. K.M. specifically testified that she was roughly ten years old when Haleman placed his penis in her mouth. K.M. testified that she tried to get away, but "he just pulled my head back down and held it there." K.M. specifically recalled that she gagged on Haleman's penis, that Haleman ejaculated on her chest, and that she took a shower afterward.

According to K.M., Haleman regularly instructed her not to tell anyone about the abuse he perpetrated on her. Indeed, K.M. testified that Haleman led her to believe that no one would believe her if she disclosed his abuse, and that she would be the one to get in trouble if she did. According to K.M., Haleman stopped abusing her sometime when she was in the fifth grade. Eventually, K.M. disclosed Haleman's abuse to her middle school counselor in December 2021. At trial, K.M. testified that she was motivated to disclose Haleman's abuse because she was fearful that Haleman would abuse her younger sisters. Although, on cross-examination, K.M. affirmed that Haleman had moved out of the family's trailer sometime during the summer of 2020.

After K.M. alleged that Haleman had abused her, Haleman consented to an interview with police, portions of which were shown to the jury. During that recorded interview, Haleman told authorities that he "very seldom" watched Christina's children, that he was "not a kid person," and that if he did watch

3

Christina's children it would only be for a few hours at a time. Haleman also told police that he "barely [knew] the girl" and that he was "lucky to see her twice a week." Haleman told police that he ultimately started looking for another place to live after Christina's children became old enough to open doors and would barge in on him while he was getting out of the shower or changing. Haleman also told police that his brother Frank had spoken to him about previous statements Christina's children had made about seeing Haleman's "pickle." Detective Rick Lawrence of the Henderson County Sheriff's Office, who interviewed Haleman, testified that the word "pickle" was a reference to Haleman's penis.

After K.M. disclosed that Haleman had sexually abused her, she underwent a forensic interview and medical examination at a local Children's Advocacy Center. Dr. Jennifer Liles, a Henderson County pediatrician, testified that she personally examined K.M. in December 2021, and began that examination by taking K.M.'s "history." Dr. Liles testified that K.M. disclosed to her that her great-uncle had touched her breasts, rubbed her vagina with his hands, and exposed himself to her. According to Dr. Liles, K.M. did not disclose that Haleman had ever penetrated her vagina. When Dr. Liles physically examined K.M., however, she discovered injuries to her genitals that were "inconsistent" or "out of proportion" with the information that K.M. had disclosed. Dr. Liles testified that she discovered three "deep notches" or tears in K.M.'s hymen. Dr. Liles also testified that she observed a more severe "full

4

transection" in K.M's hymen. According to Dr. Liles, those injuries were indicative of "blunt force trauma" and "most consistent with sexual abuse."

At trial, the jury heard that K.M. had previously been in a consensual sexual relationship with a transgender child named John[2] who was in the process of transitioning from female to male. In fact, K.M. testified that she disclosed to Dr. Liles that she was sexually active with John and that John had touched her vagina with his hands and fingers. Dr. Liles testified that the blunt force trauma injuries to K.M.'s genitals could have been caused by someone's hands or fingers. However, she also testified that K.M.'s injuries were more consistent with having been caused by a larger object, like a penis. K.M. testified that John did not have a penis.

After the Commonwealth had presented its case, it moved to amend the indictment to conform to the evidence. Haleman did not call any witnesses and did not testify in his own defense. Ultimately, the jury convicted Haleman on all counts lodged against him: one count of sodomy in the first degree and six counts of sexual abuse in the first degree. The Henderson Circuit Court sentenced Haleman to a total sentence of twenty-five years' imprisonment. This appeal followed.

Further facts will be developed below as necessary.

---

[2] We use a pseudonym to protect this child's identity and privacy.

## II.     ANALYSIS

On appeal, Haleman alleges that the trial court made three reversible errors that warrant a reversal of his convictions. However, Haleman concedes that he failed to properly preserve his objections to each of those alleged errors, and now requests palpable error review pursuant to Rule of Criminal Procedure ("RCr") 10.26. Haleman specifically argues that (1) the trial court improperly allowed Detective Rick Lawrence to suggest that there was additional evidence incriminating Haleman that he could not share with the jury, (2) the trial court improperly allowed Dr. Liles to bolster K.M.'s credibility by vouching for her truthfulness and by repeating K.M.'s prior statement identifying Haleman as her abuser, and (3) the trial court improperly admitted victim impact evidence from Christina and K.M. during the guilt phase. Haleman also argues that his convictions should be reversed on the basis of cumulative error. We disagree, and affirm the Henderson Circuit Court.

### A. Standard of Review

This Court reviews a trial court's decision to admit evidence under an "abuse of discretion" standard. *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky. 2000). A trial court abuses its discretion when its decision is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

"A palpable error which affects the substantial rights of a party may be considered . . . by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a

6

determination that manifest injustice has resulted from the error." RCr 10.26. An error is palpable if it is "easily perceptible, plain, obvious and readily noticeable." *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006). "Implicit in the concept of palpable error correction is that the error is so obvious that the trial court was remiss in failing to act upon it sua sponte." *Lamb v. Commonwealth*, 510 S.W.3d 316, 325 (Ky. 2017). "When an appellate court engages in a palpable error review, its focus is on . . . whether the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Martin v. Commonwealth*, 207 S.W.3d 1, 5 (Ky. 2006). Indeed, the concept of "manifest injustice" is synonymous with the "probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Id.* at 3.

**B. Detective Lawrence's testimony did not rise to palpable error.**

For his first assignment of error, Haleman alleges that the trial court palpably erred by allowing Detective Rick Lawrence to suggest that there was additional evidence incriminating Haleman that Detective Lawrence was prohibited from sharing with the jury. Haleman specifically takes issue with the following exchange during the Commonwealth's direct examination of Detective Lawrence:

> **Commonwealth**: I'm gonna say it. It's going to be probably frustrating for you as law enforcement to not be able to say what other folks tell you.
>
> **Detective Lawrence**: It is.
>
> **Commonwealth**: But if you could—

7

**Detective Lawrence**: Because in my process, of course, I'm based on evidence and facts, and I glean a lot of those from interviews, not only with victims, but possible witnesses and even perpetrators or suspects. And a lot of information they give me bases where I go next and leads me—just like one of your children. There's a broken lamp and you're going to talk to them and find out, you know, were they there, was there somebody else there with them, was there maybe a pet in the house? So you know where to look. It's kind of the same process I have. And to not be able to explain to you what this person said to me, and this is why I took this next step, or where I went, that is frustrating.

**Commonwealth**: With that in mind, you do understand about rules right?

**Detective Lawrence**: Yes.

**Commonwealth**: So, you could tell us how you got involved in this case without saying what anybody said to you?

On appeal, Haleman does not clearly articulate the legal basis of his challenge to the above testimony, but the case law he cites in his brief implies that his allegation of error is grounded in the concept of prosecutorial misconduct. In its briefing, the Commonwealth has also framed Haleman's assignment of error as an allegation of prosecutorial misconduct. Accordingly, we too will assess Haleman's arguments as an allegation of prosecutorial misconduct.

"Prosecutorial misconduct is 'a prosecutor's improper or illegal act involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment.'" *Dickerson v. Commonwealth*, 485 S.W.3d 310, 329 (Ky. 2016) (citing *Noakes v. Commonwealth*, 354 S.W.3d 116, 121 (Ky. 2011)). Prosecutorial misconduct "can take a variety of forms, including improper questioning and improper closing argument." *Id.* (citing *Duncan v.*

8

*Commonwealth*, 322 S.W.3d 81, 87 (Ky. 2010)). This Court has before held that a prosecutor's improper references to excluded evidence can indeed constitute prosecutorial misconduct. *Barnes v. Commonwealth*, 91 S.W.3d 564, 569 (Ky. 2002). It would therefore be logical that a prosecutor's attempts to entice a witness to comment on excluded evidence might also constitute prosecutorial misconduct. That is not, however, what occurred here.

Upon our review of the record, it appears that while the Commonwealth may have clumsily questioned Detective Lawrence, the Commonwealth did not engage in prosecutorial misconduct. When the Commonwealth stated that it might be "frustrating" for Detective Lawrence to not repeat what other people had told him during his investigation into Haleman, the Commonwealth was undoubtedly referencing the rule against "hearsay." Kentucky Rule of Evidence ("KRE") 802. Indeed, it is not uncommon, nor is it prosecutorial misconduct, for counsel to remind testifying witnesses that the Rules of Evidence prevent the admission of certain testimony.

The Commonwealth's statement, while perhaps awkwardly phrased, did not call for Detective Lawrence to testify to any of the hearsay statements that he had heard throughout his investigation, nor can we say that it is clear the Commonwealth intended to entice Detective Lawrence to allude to any inadmissible hearsay that he was prohibited from sharing. Indeed, after Detective Lawrence affirmed that he was frustrated by the rule against hearsay, the Commonwealth specifically asked him to give his testimony "without saying what anybody said to you." While Haleman attempts to paint the

9

Commonwealth as encouraging Detective Lawrence to subvert the Rules of Evidence, the alleged error here was no more than an inartful attempt to remind Detective Lawrence of the rules that governed his testimony. There was no prosecutorial misconduct here.

## C. It was error to allow Dr. Liles to repeat K.M.'s prior out-of-court statement identifying Haleman as her abuser, but that error did not result in manifest injustice.

Haleman next broadly argues that the trial court made a palpable error when it allowed Dr. Liles to "vouch" for K.M.'s credibility and the "truthfulness" of her testimony. While there was no improper vouching here, this Court does agree with Haleman's more narrow assertion that it was improper to allow Dr. Liles to repeat K.M.'s out-of-court statement identifying Haleman as her abuser. The law is clear that testimony of this kind is prohibited by the rule against hearsay and may perhaps constitute improper "bolstering." However, while it was error to admit this limited piece of evidence, that error did not result in manifest injustice warranting a reversal of Haleman's convictions.

On appeal, Haleman specifically labels the following testimony from Dr. Liles as improper "vouching" testimony:

**Commonwealth**: You said that you started with taking a disclosure from her?

**Dr. Liles**: Yes, ma'am.

**Commonwealth**: And with respect to that, except for anybody she may or may not have identified can you tell us what the kind of guts of that disclosure was?

**Dr. Liles**: Yes ma'am. The guts of her disclosure, and I'm sorry I don't have my report with me. The guts of the disclosure, basically, I just ask very open-ended questions. And so, I asked [K.M.], you

10

know, "What are you here for and what has happened to you?" And so, she did disclose that that her great-uncle had started touching her several years ago. When I asked her around about what age, she said six or seven. And I asked her what happened. And she said that he started out, that he would rub on her breasts, under her shirt. She called them boobs, sorry. Rub on her boobs under her shirt. That he would also use his hands down below in her vaginal area and rub down there. He also exposed himself to her several times and would "jerk off" in front of her . . . and that also he had her perform oral sex on him.

. . . .

**Commonwealth**: Did you ultimately form an opinion about her? When you reached your findings, did you form an ultimate opinion about her?

**Dr. Liles**: Yes, ma'am.

**Commonwealth**: Can you tell the jury what that was?

**Dr. Liles**: Sure. So after getting her disclosure and seeing her physical exam, in my opinion, a blunt force trauma did happen to her down in her genital areas. That's the only way to get injuries such as these. And it is most consistent with sexual abuse based on her disclosure . . . . And so, I can confirm blunt force trauma happened there, and it's most consistent with sexual abuse because of her disclosure that she gave me.

**Commonwealth**: But overall, you did also conclude that it was highly likely she was sexually abused?

**Dr. Liles**: Yes.

**Commonwealth**: OK. And was that opinion as it's expressed today, was that something that was based on a reasonable degree of medical certainty in the community as well as based on your extensive training and experience?

**Dr. Liles**: Yes, ma'am.

To "vouch" for a witness's credibility is to express a belief about the

veracity or truthfulness of that witness's testimony or prior statements. *See*

ROBERT G. LAWSON, THE KENTUCKY EVIDENCE LAW HANDBOOK § 4.00[2][b] (2024).

11

Vouching is prohibited by law because such testimony "invades the province of the jury" as the sole arbiter of witness credibility. *Hall v. Commonwealth*, 862 S.W.2d 321, 323 (Ky. 1993). The prohibition on vouching serves to exclude even "indirect" testimony that bears on the veracity of another witness's statements. *Stephens v. Commonwealth*, 680 S.W.3d 887, 900 (Ky. 2023) (citing *Hoff* v. *Commonwealth*, 394 S.W.3d 368, 376 (Ky. 2011)). Indeed, in prior cases regarding allegations of childhood sexual abuse, this Court has held that the prohibition on vouching even precludes testimony that a witness had "no reason not to believe" a child victim, *Hoff*, 394 S.W.3d at 376, or testimony that a witness found a victim's prior statements to be "spontaneous" and "unrehearsed." *Bell v. Commonwealth*, 245 S.W.3d 738, 744–45 (Ky. 2008), overruled on other grounds by *Harp v. Commonwealth*, 266 S.W.3d 813 (Ky. 2008).

It is not vouching, however, for a medical professional to testify that a child victim's injuries are "consistent with sexual abuse" or "consistent with the history given by the child." *Hoff*, 394 S.W.3d at 377. It is also not vouching for a qualified medical professional to deliver an ultimate opinion that a child "has been sexually abused" when that opinion is founded upon "physical evidence." *Id*. at 376–77. This kind of testimony assists the trier of fact, and is admissible, because "[t]he average juror does not know what kind of injuries a child victim of sex abuse is likely to have." *Id*. at 375. Accordingly, here, Dr. Liles's testimony that K.M.'s injuries were "most consistent" with an act of sexual abuse, and Dr. Liles's affirmation that it was likely that K.M. was sexually

12

abused, did not run afoul of the general prohibition on "vouching." It was, however, error for Dr. Liles to testify as to K.M.'s prior hearsay statement that it was her "great-uncle" who had abused her.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." KRE 801(c). "Hearsay is not admissible except as provided by [the Kentucky Rules of Evidence] or by rules of the Supreme Court of Kentucky." KRE 802. Pursuant to KRE 803(4), a medical professional may be permitted to testify to prior out-of-court statements that a patient made "for purposes of medical treatment or diagnosis and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment or diagnosis." "[T]he hearsay exception of KRE 803(4) is founded upon the notion that a declarant seeking treatment has a selfish motive to be truthful because the effectiveness of medical treatment depends upon the accuracy of the information provided." *Tackett v. Commonwealth*, 445 S.W.3d 20, 27 (Ky. 2014) (citing *Colvard v. Commonwealth*, 309 S.W.3d 239, 244 (Ky. 2010)).

In the context of childhood sexual abuse cases, hearsay statements made by a child to a medical professional detailing *how* that child was abused can be admissible under KRE 803(4) because those statements "describe[] the cause or external source of [the child's] injury." *Hoff*, 394 S.W.3d at 372. However, "a child sex abuse victim's identification of his or her abuser is not generally

13

admissible under KRE 803(4)." *Sanchez v. Commonwealth*, 680 S.W.3d 911, 925 (Ky. 2023). A child victim's identification of his or her sexual abuser generally does not "arise from the patient's desire for effective medical treatment," and therefore lacks "inherent trustworthiness." *Colvard*, 309 S.W.3d at 245–46. Indeed, these identifications "contain[] the same tangible risks of unreliability generally inherent in all hearsay testimony." *Id.* at 247.

Here, we cannot say that K.M.'s prior statement identifying Haleman as her abuser was relevant to the source of her injuries, her medical treatment, or her diagnosis. Accordingly, it was undoubtedly error to allow Dr. Liles to repeat K.M.'s prior hearsay statement to the jury. Indeed, it appears that even the Commonwealth was aware that K.M.'s prior statement identifying Haleman as her abuser would likely be inadmissible. In fact, the Commonwealth specifically asked Dr. Liles to relay K.M.'s prior disclosure to the jury without naming "anybody she may or may not have identified." It appears, however, that Dr. Liles failed to honor the Commonwealth's request, and Haleman did not object to the admission of this evidence. Nevertheless, this fleeting error did not result in "manifest injustice" and does not rise to the level of "palpable error" warranting reversal.

"The burden to demonstrate palpable error is high, as a defendant must show that the error involved prejudice more egregious than that occurring in reversible error." *Grady v. Commonwealth*, 325 S.W.3d 333, 355 (Ky. 2010). The error "should be so egregious that it jumps off the page and cries out for relief." *Behrens v. Commonwealth*, 677 S.W.3d 424, 432 (Ky. 2023) (cleaned up)

14

(quoting *Davis v. Commonwealth*, 620 S.W.3d 16, 30 (Ky. 2021)). "Even where an error is palpable, relief is warranted only where it also results in manifest injustice." *Id.* (citing *Commonwealth v. Caudill*, 540 S.W.3d 364, 367 (Ky. 2018)). "An error results in manifest injustice if it so seriously affected the fairness, integrity, or public reputation of the proceeding as to be shocking or jurisprudentially intolerable." *Id.* (internal quotation marks omitted) (quoting *Conrad v. Commonwealth*, 534 S.W.3d 779, 783 (Ky. 2017)).

This Court's prior decisions make clear that the erroneous admission of a victim's hearsay statement identifying his or her abuser does not always necessitate reversal. Indeed, it appears that this Court has only endeavored to reverse a defendant's criminal convictions because of error of this kind when multiple distinct errors have also permeated the defendant's trial.

In *Colvard v. Commonwealth*, this Court held that it was error for the trial court to have allowed *three* separate medical professionals to testify as to two victims' identifications of the defendant as the perpetrator of their sexual abuse. 309 S.W.3d at 247. Unlike this case, however, the defendant in *Colvard* had properly preserved his objections to the challenged evidence at trial, and this Court accordingly assessed the errors using our familiar "harmless error" standard of review. *Id.* at 249. Relevant here, the *Colvard* Court ultimately reversed the defendant's convictions, but specifically noted that the erroneous admission of the victims' identifications of the defendant warranted reversal "in combination with other inadmissible hearsay statements let into trial[.]" *Id.* at 247. Importantly, the Court identified three *other* inadmissible hearsay

15

statements that had also been erroneously admitted at trial. *Id.* at 247–49.

Specifically, it was the "multiple instances of hearsay testimony" admitted at

trial that had the cumulative effect of necessitating a reversal of the

defendant's convictions in *Colvard*. *Id.* at 250.

In *Justice v. Commonwealth*, this Court held that it was error for the trial

court to have allowed *two* doctors to testify that two separate victims had each

previously identified the defendant as their abuser. *Justice v. Commonwealth*,

636 S.W.3d 407, 415 (Ky. 2021), abrogated on other grounds by *Sexton v.

Commonwealth*, 647 S.W.3d 227 (Ky. 2022). Importantly, the *Justice* Court also

noted that the doctors' accompanying medical reports admitted into evidence

had been properly "redacted" so as to remove any prior statements of the

victims that identified the defendant as their abuser. *Id.* Like in this case, the

*Justice* Court thereafter assessed whether the hearsay errors it had identified

rose to "palpable error" necessitating a reversal of the defendant's convictions.

*Id.* The Court ultimately and summarily held that while the doctors' repetition

of the victims' "identifying statements prejudicially bolstered [the victims']

testimony," those errors were not of an "egregious nature that shocks the

conscience." *Id.*

In *Sanchez v. Commonwealth*, this Court recently held that it was error to

allow *one* medical professional to testify as to a victim's prior out-of-court

statement identifying the defendant as her abuser. 680 S.W.3d 911, 924–25

(Ky. 2023). That medical professional's unredacted report containing the same

inadmissible hearsay statement was *also* admitted into evidence. *Id.* at 920,

16

925. Unlike this case, however, the *Sanchez* Court determined whether that error necessitated reversal using the "harmless error" standard of review. *Id.* at 925. Ultimately, the Court determined that reversal was *not* necessary because there was a plethora of other independent evidence tending to prove the defendant's guilt in addition to the victim's testimony. *Id.*

Unlike in *Colvard*, *Justice*, and *Sanchez*, we are confronted here with only *one* distinct piece of inadmissible hearsay: Dr. Liles's testimony repeating K.M.'s statement that her great-uncle had abused her. Here, that error was not compounded by the erroneous testimony of *multiple* medical professionals, Dr. Liles's medical report was not admitted into evidence, and there were not *multiple* pieces of inadmissible hearsay admitted throughout Haleman's trial. Accordingly, the isolated nature of Dr. Liles's inadmissible statement suggests that "manifest injustice" did not occur here, and that reversal is not necessary.

Further, we are certain that the admission of Dr. Liles's testimony did not result in "manifest injustice" because the record indicates that Haleman vigorously cross-examined Dr. Liles and even attempted to use Dr. Liles's testimony regarding K.M.'s disclosure to his benefit. In fact, after Dr. Liles had testified on direct examination that K.M. identified Haleman as her abuser, Haleman asked Dr. Liles to confirm that earlier testimony and initiated the following line of questioning on cross-examination:

> **Defense**: Now, Dr. Liles, I want to start with the disclosure that [K.M.] gave you on the date of the exam. She disclosed he basically—her great-uncle had her perform oral sex and he fondled her? Is that correct?

17

**Dr. Liles**: That's part of it, yes.

**Defense**: Grabbed her breasts . . . she didn't indicate any digital penetration?

**Dr. Liles**: She indicated hands and fingers down in her private area, but she . . . did say that they did not penetrate. She did disclose that.

**Defense**: She disclosed no penetration?

**Dr. Liles**: Yes.

**Defense**: So, and she also disclosed to you that she also had another sexual partner?

**Dr. Liles**: Yes.

**Defense**: OK. That did use fingers and hands to the genitals?

**Dr. Liles**: Yes

**Defense**: And there was penetration on that?

**Dr. Liles**: I don't think I have in my report that I have that it penetrated, so I don't recall. Plus from 2021, I don't remember. Because in reviewing my report I didn't mention that in particular, but you're correct that hands and fingers were in the vaginal area. I think that was how it was disclosed.

From this line of questioning, it is apparent that Haleman purposely attempted to highlight the inconsistency between the alleged abuse that K.M. had attributed to him, *i.e.*, inappropriate touching and an act of sodomy, and the severity of the injuries to K.M.'s genitals attributable to "blunt force trauma." Indeed, it was Haleman who later elicited from Dr. Liles that K.M.'s injuries were "inconsistent" or "out of proportion" with her disclosure. In conclusion, it may have perhaps even benefitted Haleman to highlight the alleged acts of abuse that K.M. had attributed to him during her examination

18

at the Children's Advocacy Center, because those alleged acts of abuse were *not* clearly corroborated by the physical evidence. In light of Haleman's vigorous cross-examination of Dr. Liles, it is difficult to say that the admission of Dr. Liles's earlier testimony so "seriously affected the fairness, integrity, or public reputation of the proceeding as to be shocking or jurisprudentially intolerable." *Behrens*, 677 S.W.3d at 432 (internal quotation marks omitted) (quoting *Conrad*, 534 S.W.3d at 783).

Finally, we have fair assurance that no manifest injustice resulted from Dr. Liles's erroneous testimony because Haleman has not demonstrated a "substantial probability" that the jury would have returned a "different result" if that evidence had not been admitted. *Martin*, 207 S.W.3d at 3. Indeed, while there was not an abundance of evidence incriminating Haleman, the evidence that did incriminate him was largely uncontradicted. Haleman presented no witnesses to testify on his behalf, and—consistent with his Fifth Amendment rights—he did not take the stand himself. Further, despite the fact that she purported to have been sexually abused for the first time in first grade, K.M. was able to recall in some detail *how* she was abused and *where* that abuse took place. And it was obvious that K.M. better remembered the alleged instances of abuse that occurred closer in time to her testimony. For instance, K.M. recalled that when Haleman allegedly placed his penis in her mouth, she struggled to get away, he pulled her head back down, he ejaculated on her chest, and she took a shower afterward. It is clear that K.M.'s testimony must have carried some weight with the jury.

19

Accordingly, while we can say with fair assurance that it was error to have allowed Dr. Liles to repeat K.M.'s prior hearsay statement, the admission of that lone hearsay statement does not necessitate a reversal of Haleman's convictions. This error was not shocking or jurisprudentially intolerable, and likely did not persuade the jury to convict Haleman. There was no manifest injustice here, only a common evidentiary error that Haleman failed to challenge at trial.

**D. There was no improper "victim impact evidence" admitted during the guilt phase of Haleman's trial.**

Haleman next argues that the trial court made a reversible error when it failed to sua sponte exclude what he labels as improper "victim impact evidence" admitted during the guilt phase of his trial. Haleman specifically challenges the following testimony the Commonwealth elicited from K.M.'s mother, Christina, on direct examination:

> **Commonwealth**: So, after you took [K.M.] to meet with Dr. Liles and the [Children's Advocacy Center] did you take her anywhere else after that?
>
> **Christina**: She started therapy.
>
> **Commonwealth**: She started therapy. OK. Is there anything that you noticed about her behavior at that time?
>
> **Christina**: I noticed she was very shut down.
>
> **Commonwealth**: What do you mean by that?
>
> **Christina**: She didn't really want to open up as much, conversate, get into activities, long sleeps in the summertime.

Haleman also challenges testimony from Christina and K.M. wherein each witness testified that K.M. had started cutting herself during her childhood.

20

The introduction of "victim impact evidence" during the guilt phase of a defendant's trial can constitute reversible error. *Tackett v. Commonwealth*, 445 S.W.3d 20, 33 (Ky. 2014) (quoting *Ernst v. Commonwealth*, 160 S.W.3d 744, 763 (Ky. 2005), declined to follow on other grounds by *Mason v. Commonwealth*, 559 S.W.3d 337 (Ky. 2018). The rational for excluding victim impact evidence is that evidence of this kind is "largely irrelevant to the issue of guilt or innocence," and this Court has recognized that "the rule is intended to prevent emotional convictions." *Roe v. Commonwealth*, 493 S.W.3d 814, 823 (Ky. 2015).

There is a crucial distinction, however, between victim impact evidence and "victim background evidence." *Id.* Impermissible victim impact evidence is "aimed primarily at appealing to the jurors' sympathies," whereas victim background evidence provides "an understanding of the nature of the crime." *Alderson v. Commonwealth*, 670 S.W.3d 884, 893 (Ky. 2023) (quoting *Tackett*, 445 S.W.3d at 33). This Court has before distinguished between the two types of evidence by "inquiring whether the witness was overly emotional, condemnatory, or accusatory in nature." *Roe*, 493 S.W.3d at 824. Importantly, however, "[t]estimony does not become prejudicial victim-impact evidence simply because it elicits an emotional response from the witness." *Id.*

While the evidence here—that K.M. had become more reserved and resorted to self-harm after she was allegedly abused by Haleman—certainly bears some similarity to victim impact evidence, we cannot say with certainty that the challenged testimony was introduced primarily to appeal to the jury's

21

sympathies. Nor were Christina and K.M. overly emotional when they delivered this testimony. Rather, it appears from the record that the challenged testimony had some relevance to rebut Haleman's repeated assertions that K.M. had fabricated or manufactured her allegations. Indeed, beginning with his opening statement, Haleman placed the issue of K.M.'s credibility at the forefront of this trial. During that opening statement, Haleman's defense counsel stated:

> She [K.M.] wants the attention. The evidence is going to show that she created this story to get attention. She's got three siblings at home. They're all younger. [Christina's] giving them that attention, grandfather's giving them that attention, no one's giving her any attention. [John's] not. She wants the attention. That's why she's cutting. That's what the evidence is going to show. That's why she made these reports, and that's why she didn't say anything until 2021. The evidence will show this didn't happen. She convinced herself that it did because she wanted the attention, now she's locked into her statement.

Haleman's immediate attacks on K.M.'s credibility make this case similar to *Tackett v. Commonwealth*, wherein this Court held that evidence having "elements of victim impact testimony" was nonetheless admissible and "relevant to show that [the victim] was not fabricating [her] allegations." 445 S.W.3d at 33–34. There, the challenged evidence tended to prove that the victim had an "unpleasant and embarrassing" experience at a Children's Advocacy Center following her abuse, and that she had been seeing a psychiatrist. *Id.* at 25, 33. This Court ultimately held that the admission of that evidence did not rise to the level of palpable error and did not result in manifest injustice. *Id.* at 34.

22

Accordingly, we have no trouble concluding here that the brief testimony that Haleman labels as improper victim impact testimony was actually relevant and admissible to rebut Haleman's assertions that K.M. had never been abused, and that she had instead fabricated her allegations. More simply, the challenged testimony bearing on K.M.'s demeanor after she was allegedly abused was relevant to prove that her actions were consistent with those of someone who had in fact been abused. Therefore, we discern no palpable error here.

**E. The doctrine of "cumulative error" does not require that we reverse Haleman's convictions.**

Haleman finally argues that the doctrine of cumulative error necessitates that this Court reverse his criminal convictions. However, because this Court has only identified *one* error in Haleman's trial—which did not alone necessitate reversal—the doctrine of cumulative error is unavailable to Haleman.

Under the cumulative error doctrine, "multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair. We have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010). "If the errors have not 'individually raised any real question of prejudice,' then cumulative error is not implicated." *Elery v. Commonwealth*, 368 S.W.3d 78, 100 (Ky. 2012) (quoting *Brown*, 313 S.W.3d at 631).

23

Accordingly, because Haleman has only identified one individual error—the admission of K.M.'s prior hearsay statement identifying him as her abuser—the cumulative error doctrine does not require that we reverse his convictions.

## III. CONCLUSION

For the foregoing reasons, we affirm the Henderson Circuit Court.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Robert Chung-Hua Yang
Assistant Public Advocacy

COUNSEL FOR APPELLEE:

Russell M. Coleman
Kentucky Attorney General

Matthew Robert Krygiel
Assistant Attorney General

24